COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Frank, Alston and Senior Judge Bumgardner
Argued at Chesapeake, Virginia


GARY ALEXANDER CUFFEE

                                                          OPINION BY
v.        Record No. 1971-11-1                  JUDGE ROSSIE D. ALSTON, JR.
                                                          JANUARY 8, 2013
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie A. Taylor Arrington, Judge

Kimberly E. Karle, Assistant Public Defender (Office of the Public
Defender, on brief), for appellant.

Benjamin H. Katz, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Gary Alexander Cuffee (appellant) appeals his convictions for two counts of attempted

malicious shooting in violation of Code §§ 18.2-51 and -26, two counts of use of a firearm in the

commission of a felony (attempted malicious shooting) in violation of Code § 18.2-53.1,

discharge of a firearm while on public property within 1,000 feet of a school in violation of Code

§ 18.2-280(C), and possession of a firearm by a convicted felon in violation of Code

§ 18.2-308.2.  On appeal, appellant argues that the trial court erred in (1) convicting appellant of

all of the offenses because the evidence was insufficient to prove that appellant was the

perpetrator; (2) convicting appellant of discharging a firearm on public property within 1,000

feet of a school because the evidence was insufficient to show that appellant discharged a firearm

on "government owned property"; and (3) convicting appellant of attempted malicious shooting

of Beverly Smith, and the related count of use of a firearm in the commission of that offense,

because the evidence was insufficient to show that appellant had the specific intent to shoot or wound Beverly. For the reasons that follow, we sustain the trial court's determinations on the assignments of error identified by appellant and therefore affirm appellant's convictions.

I. Background

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). As a result, we must "'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis omitted) (quoting Wright v. Commonwealth, 196 Va. 132, 137, 82 S.E.2d 603, 606 (1954)).

So viewed, the evidence indicated that in the early morning hours on August 13, 2010, Beverly Smith left the home of her father, Joe Smith,[1] near the Broadlawn apartment complex in the city of Chesapeake, to find her stepbrother. As Beverly walked in the area of the Broadlawn apartment complex near Stowe Street, appellant called out to Beverly and asked her to come over. Beverly, who did not know appellant, refused. Appellant asked Beverly if she smoked, and when she replied that she did not, appellant told Beverly to go back inside her house. Beverly refused, and appellant responded, "Go in the house before I make you go in the house."

Shortly after this encounter, Beverly returned to Joe's house and Joe learned of her exchange with appellant. At Joe's request, Beverly led Joe to appellant's location behind a home on Stowe Street, where appellant stood with a companion. Joe was not previously acquainted with appellant but had "seen him on a couple of occasions" in the Broadlawn complex.

---

[1] Because Beverly Smith and Joe Smith share the same last name, for the sake of clarity, we will refer to them by their first names in this opinion.

Joe and appellant got into an argument that lasted approximately ten minutes. Beverly was present during the argument and stood nearby. Joe cursed at appellant and generally acted as the aggressor in the argument. Appellant listened passively. After the argument, appellant walked in front of the home on Stowe Street behind which the men had been arguing.

About five minutes later, Beverly saw appellant return, waving a firearm up and down and shouting repeatedly, "Tell him to come down. Tell him to say what he has to say. Ask him what he [has] to say now." Appellant walked in the street waving the gun around and then walked "behind a car" parked on the street opposite from where Beverly stood. Beverly told Joe that appellant had a gun, and Beverly and Joe fled to behind a nearby tree. Appellant fired four or five shots in Beverly's and Joe's direction. According to Beverly, the shots came so close to her that she could feel the bullets pass by her.

Joe told Beverly to run behind the neighboring houses on Stowe Street. As Beverly ran, Joe ran in a different direction, crossing Stowe Street to the side on which appellant stood. Appellant fired two or three shots at Joe as he crossed the street. Joe ran behind one of the Broadlawn apartment buildings and hopped the fence separating the complex from the street on which his house was located. As Joe jumped the fence, appellant fired at him again. After traveling a circuitous route for about thirteen minutes, Joe escaped appellant, returned to his house, and called the police. Police responded to Joe's home at 1:38 a.m. Police recovered a casing from a spent .45 caliber round at the house on Stowe Street where Joe said the shooting took place, on the side of the house "closest to the street." They also recovered a spent .45 caliber bullet at the back of the house.

On August 17, 2010, Detective James A. Gainer showed Joe a photographic array he created based on Joe's description of his assailant, generated by a database that combined

Department of Motor Vehicles photographs with those of city jail inmates at random. Detective Gainer instructed Joe that the suspect he had previously described to police may or may not have been present in the photographs. Joe examined the photo array for two to three seconds, scanned each image, and selected appellant. Detective Gainer asked Joe "if he was positive," and Joe said that "[y]es, he was positive that it was . . . the picture of the suspect." Joe told Detective Gainer that he had taken a few seconds to identify appellant because he thought the picture in the array was old and, as a result, he had to concentrate in order to be certain. Detective Gainer confirmed that the picture was an older one and told Joe he had positively identified appellant, who was suspected of the offense. Detective Gainer later testified at trial regarding Joe's identification of appellant from the photo array, and the photo array with Joe's marking identifying appellant was introduced into evidence.

In December 2010, appellant was indicted for two counts of attempted malicious shooting, two counts of use a firearm in an attempted malicious shooting, discharging a firearm upon public property within 1,000 feet of a school, and possession of a firearm after having been previously convicted of a felony.

A bench trial commenced on March 10, 2011. Joe testified regarding the events of the shooting as described above. Joe testified that he argued with appellant around 10:00 p.m., though he acknowledged that it "possibly" could have been "much later than that." Joe testified that it was dark outside and that the location of the altercation was lit with streetlights, though some were out that evening. Joe described appellant as wearing a white T-shirt and said that appellant wore his hair in dreadlocks. However, Joe could not remember what kind of pants appellant wore. He acknowledged that he testified during the preliminary hearing that the man with whom he argued wore a white T-shirt and khaki pants but said he was no longer certain the

man wore khaki pants. Joe also said he could not remember if his assailant had facial hair, as appellant did. In addition, Joe stated that he thought his assailant was taller than appellant. Regarding the shooting, Joe testified that he could see only a figure standing in a "shooting stance" and wearing a white shirt. At trial, Joe identified appellant as the man he argued with on the night of the shooting.

Joe also testified about his identification of appellant from the photo array. He testified that he told Detective Gainer he had "a hard time identifying the individual" because the picture was old. He also said that he was "hesitantly" able to select the person with whom he argued and who was the shooter from the array because he "had to really sit down and concentrate" because the picture was older. Joe testified that he concentrated closely and was able to identify appellant because "certain features" reminded him of his niece, including the structure of appellant's mouth area and nose area.

Beverly also testified regarding the events of August 13, 2010. Like Joe, Beverly testified that appellant wore a white shirt. She testified that the man who shot at her and Joe was the same man with whom Joe had argued earlier in the night. She said she saw appellant with a gun from across the street. She acknowledged that when she described the shooter to the police she was not "[one] hundred percent certain about what he looked like" but that she told them he had "long dreads" and was "brown-skinned." Like Joe, Beverly testified that she thought the shooter was taller than appellant.

Following the Commonwealth's case-in-chief, appellant moved to strike the evidence, arguing that the identification of appellant as the perpetrator of the shootings was insufficient. The trial court denied appellant's motion to strike.

During appellant's case-in-chief, appellant presented the testimony of his mother, sister, and friend regarding appellant's whereabouts on the evening of August 12, 2010, and the morning of August 13, 2010. Appellant's mother, Sylvia Cuffee,[2] testified that appellant was playing video games in the family home on Johnson Street on the evening of August 12, 2010, when Sylvia left for a birthday party for appellant's grandmother. Sylvia testified that appellant was still playing video games in the house when she returned home that night. Sylvia said she went to sleep in the house and did not awaken until noon the next day, and she did not remember if appellant was there when she awoke. Sylvia testified that Broadlawn was ten miles from the house on Johnson Street and not within walking distance. However, Sylvia testified inconsistently regarding what room of the house appellant was in when she observed him playing video games before and after the party and the room of the house in which she slept.

Appellant's friend, Cleveland Person, also testified that he, appellant, and other members of appellant's family played video games in the house on Johnson Street until about midnight. Person testified that he saw appellant the next day when he picked him up at noon and that appellant did not drive. Person's testimony regarding the room in which he and appellant played video games that night contradicted Sylvia's testimony.

Finally, appellant's sister, Daphne Cuffee, testified that appellant, Person, and other family members played video games in the house on Johnson Street on the night of August 12, 2010. Like Person, Daphne's testimony regarding the room in the house in which appellant played the games contradicted Sylvia's testimony. Daphne testified that appellant was asleep on the floor of the living room when she left for work the next morning at 6:00 a.m.

---

[2] Because this opinion discusses the testimony of both Sylvia Cuffee and Daphne Cuffee, who share the same last name with each other as well as with appellant, for the sake of clarity, we will refer to Sylvia Cuffee and Daphne Cuffee by their first names in this opinion.

Following Daphne's testimony, the Commonwealth asked that appellant's witnesses' testimony be struck. The Commonwealth alleged that someone had gone in and out of the courtroom during the witnesses' testimony and discussed the testimony with the witnesses. Detective Gainer told the trial court that he had overheard part of a conversation between an unknown individual and the witnesses potentially discussing testimony, although he did not hear the contents of the entire conversation. The trial court denied the Commonwealth's motion because there was no evidence of the details of the conversation between the unknown individual and the witnesses.

Appellant then renewed his motion to strike, arguing that appellant's witnesses had established an alibi for appellant and the eyewitness testimony linking appellant to the shooting was inadequate. Appellant also argued that Code § 18.2-280(C) requires proof that appellant discharged a firearm on "public property" and the Commonwealth had not proven that appellant fired a gun from property owned by the government. During this portion of appellant's argument, the following exchange occurred:

> [APPELLANT'S COUNSEL]: The argument, Your Honor, is that the Commonwealth has to establish the property is, in fact public property, and public property means property owned by the government . . . there are public streets and there are private streets, and, again, there has been no testimony, no evidence, at least by the Commonwealth, that this particular street was public property . . . .
>
> THE COURT: In all of Broadlawn, you think there may be private streets?
>
> [APPELLANT'S COUNSEL]: I'm not saying there is or isn't. I'm saying the Commonwealth hasn't established that.

Finally, appellant argued that the Commonwealth had not proven appellant's specific intent to maliciously shoot Beverly to support the attempted malicious shooting charge.

The trial court denied appellant's motion to strike. The trial court found that Beverly identified appellant as the man who spoke to her and who later had a gun. The trial court also found that Joe identified appellant. The trial court stated, "The Court accepts the testimony of the Commonwealth's witnesses. I have no reason to find that it's not credible." Regarding appellant's witnesses, the trial court said that it had "some issues" with their testimony and noted that many of the witnesses "contradicted each other." The trial court stated that it found "for the most part the testimony of the witnesses presented by [appellant] is not credible." The trial court then found appellant guilty of all of the charges against him.

On September 21, 2011, the trial court entered a sentencing order sentencing appellant to a total of twenty-two years' imprisonment, with twelve years suspended. This appeal followed.

## II. Analysis

### A. Standard of Review

"When a defendant on appeal challenges the sufficiency of the evidence to sustain a conviction, we must examine the evidence that supports the conviction and allow the conviction to stand unless it is plainly wrong or without evidence to support it." Vincent v. Commonwealth, 276 Va. 648, 652, 668 S.E.2d 137, 139-40 (2008) (citing Code § 8.01-680; Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998)). This Court does not substitute its judgment for that of the trier of fact. See Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992). A reviewing court does not "'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Stevens v. Commonwealth, 46 Va. App. 234, 249, 616 S.E.2d 754, 761 (2005) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)), aff'd, 272 Va. 481, 634 S.E.2d 305 (2006). Rather, "[t]he issue upon appellate review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at 319).

### B. Issue I: Sufficiency of the Identity Evidence

On appeal, appellant first alleges that the trial court erred in finding the evidence sufficient to support all of his convictions because the victims' identifications were equivocal and appellant presented an alibi. For the reasons that follow, we find that the trial court did not err.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." Blevins v. Commonwealth, 40 Va. App. 412, 423, 579 S.E.2d 658, 663 (2003) (citing Brickhouse v. Commonwealth, 208 Va. 533, 536, 159 S.E.2d 611, 613-14 (1968)). The factors set forth in Neil v. Biggers, 409 U.S. 188 (1972), are used to determine "whether the identification evidence is sufficient, standing alone or in combination with other evidence, to prove beyond a reasonable doubt" the identity of the perpetrator. Brown v. Commonwealth, 37 Va. App. 507, 522, 559 S.E.2d 415, 423 (2002); see also Smallwood v. Commonwealth, 14 Va. App. 527, 530, 418 S.E.2d 567, 568 (1992).

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200. In evaluating the reliability of the identification, this Court looks to the totality of the circumstances. See Miller v. Commonwealth, 7 Va. App. 367, 373, 373 S.E.2d 721, 724 (1988).

Under the Biggers factors, we hold that Joe's and Beverly's identification of appellant together was sufficient to prove his identity as the shooter and therefore to support his convictions.

Joe reliably identified appellant as the man with whom he argued on the night of the shooting. Joe had ample opportunity to observe appellant, having spent ten minutes standing near to him and arguing with him that night. Cf. Charity v. Commonwealth, 24 Va. App. 258, 263, 482 S.E.2d 59, 61 (1997) (holding that the victim's identification of the defendant was not unreliable where the victim had observed the intruder for seventeen seconds and came within ten feet of him). Joe's identification of appellant was made only four days after the shooting. Cf. Currie v. Commonwealth, 30 Va. App. 58, 62, 74, 515 S.E.2d 335, 337, 343 (1999) (finding the victim's identification of the defendant was not unreliable where she identified him in a photo lineup three days after the crime); Charity, 24 Va. App. at 263, 482 S.E.2d at 61 (holding that the victim's identification of the defendant was not unreliable where she identified the defendant as her assailant in a lineup seven months after the crime and then again five months later at trial). Joe also paid close enough attention to appellant's appearance that he could identify the "structure" of appellant's face and compare it to that of his niece. Joe expressed a high level of certainty in identifying appellant, as, according to Detective Gainer, Joe told Detective Gainer he was "positive" appellant was the suspect. In addition, Joe noted that both the man with whom he argued and the shooter wore a white shirt, suggesting that they were one and the same. Any hesitancy Joe had in identifying appellant was reasonably explained by Joe's intense concentration to ensure he selected the right individual and the age of the picture of appellant used in the photo array.

Similarly, Beverly's identification of appellant as the shooter was reliable. Beverly testified that she was not "[one] hundred percent" certain that appellant was the shooter. However, Beverly testified unequivocally that the same man who argued with Joe was the shooter. Beverly's description of the shooter's statements before he began shooting corroborated her testimony that the shooter was the same man who argued with Joe, since the shooter's statements referenced the argument. Beverly observed appellant face-to-face when he spoke to her as she walked down the street and as he argued with Joe. Beverly also observed appellant during the shooting from across the street, approximately twenty yards away. Beverly described the assailant as having "dreads" and being "brown-skinned," both of which comport with appellant's appearance. Together with Joe's identification of appellant as the man with whom he argued, Beverly's testimony that the shooter was the same man who argued with Joe was sufficient to identify appellant as the shooter.

Inconsistencies in Beverly's and Joe's identifications of appellant relied upon by appellant do not render their identifications unreliable. Although both Joe and Beverly testified that they thought their assailant (who, at the time they saw him, was shooting at them) was taller, and they could not identify appellant's clothing beyond their description of his white T-shirt, these inconsistencies go toward the trial court's weighing of the credibility of the witnesses, a matter within its sound discretion. Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). Appellant's suggestion that Joe identified appellant as the man he argued with because Joe had seen appellant in Broadlawn previously is also unavailing. See Currie, 30 Va. App. at 73, 515 S.E.2d at 342-43 (rejecting the defendant's argument that the victim identified him as her attacker "because [the defendant] had been in the victim's neighborhood earlier that week"). Finally, the witnesses presented by appellant in support of his

alibi gave inconsistent testimony. The trial court specifically credited the testimony of the Commonwealth's witnesses and found that the defense witnesses' testimony was not credible. These findings were not an abuse of discretion, and we will not disturb them on appeal. See Sandoval, 20 Va. App. at 138, 455 S.E.2d at 732.

Based upon the totality of the circumstances, we find that Joe's and Beverly's testimony together sufficed to establish the identity of appellant as the shooter. Therefore, we hold that the trial court did not err in finding the evidence of appellant's identity as the shooter sufficient to support appellant's convictions.

## C. Issue II: Discharging a Firearm on Public Property

Appellant argues next that the trial court erred in finding the evidence sufficient to sustain his conviction for discharging a firearm on public property within 1,000 feet of a school because the evidence was insufficient to show that he discharged the firearm on "government owned property."[3] We hold that the evidence was sufficient and the trial court did not err.

Code § 18.2-280(C) provides,

> If any person willfully discharges or causes to be discharged any firearm upon any public property within 1,000 feet of the property line of any public, private or religious elementary, middle or high school property he shall be guilty of a Class 4 felony, unless he is engaged in lawful hunting.

In interpreting Code § 18.2-280(C), we agree with appellant that the phrase "any public property" means property owned by the government. Black's Law Dictionary defines "public property" as "[s]tate- or community-owned property not restricted to any one individual's use or possession." Black's Law Dictionary 1233 (7th ed. 1999). In accordance with this commonly

---

[3] Appellant does not challenge the sufficiency of the evidence establishing that he was within 1,000 feet of a school.

accepted definition, we hold that Code § 18.2-280(C) requires proof that a defendant fired a firearm from property owned by the government.

Given this interpretation, we cannot say that the trial court's implicit factual finding that appellant fired his gun from public property was plainly wrong or without evidence to support it. The trial court took judicial notice that the streets of Broadlawn were public property through its comment, "In all of Broadlawn, you think there may be private streets?"[4] Beverly testified that appellant shot his gun from across the street after he walked "behind a car."[5] Viewing the evidence in the light most favorable to the Commonwealth as we must on appeal, Beverly's testimony in this regard must be interpreted to be that appellant shot from the rear of the vehicle parked on the street. Thus, it supports the trial court's conclusion that appellant shot from the street, which was public property. Therefore, we affirm appellant's conviction under Code § 18.2-280(C).

### D. Issue III: Attempted Malicious Shooting of Beverly

Finally, on appeal, appellant argues that the evidence was insufficient to support his conviction for attempted malicious shooting of Beverly because the evidence did not show

---

[4] Although appellant, through counsel, argued on brief that the trial court did not take judicial notice that the streets of Broadlawn were public property, during oral argument appellant's counsel conceded that the trial court did take judicial notice of this fact. Because appellant thereby abandoned his argument regarding judicial notice, we will not address it. See Groves v. Commonwealth, 50 Va. App. 57, 61 n.1, 646 S.E.2d 28, 30 n.1 (2007) (stating that the Court would not address the appellant's argument regarding sufficiency of the evidence where the appellant had expressly abandoned it by concession at oral argument).

[5] Although Beverly referred extensively to a diagram throughout her testimony, this diagram is not included in the joint appendix on appeal. "[T]he [trial court's] judgment is presumptively correct and the burden is on the appellant to present a sufficient record to permit a determination whether the circuit court committed an alleged error." Commonwealth v. Williams, 262 Va. 661, 669, 553 S.E.2d 760, 764 (2001). In the absence of any evidence in the record before us that Beverly's testimony was not that appellant fired his gun from the street, such as the diagram referred to by Beverly during her testimony, we are unable to say that the trial court erred.

appellant's specific intent to shoot Beverly. Appellant argues that the evidence showed only that Beverly was present at the scene of the shooting and in close proximity to Joe, appellant's intended victim. Thus, according to appellant, the evidence was insufficient to show appellant intended to shoot Beverly. We disagree.

Appellant was convicted of attempted malicious shooting under Code §§ 18.2-51 and -26. Code § 18.2-51 provides, in pertinent part, "If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony."

"'An attempt to commit a crime is composed of two elements: (1) The intent to commit it; and (2) a direct, ineffectual act done towards its commission.'" Haywood v. Commonwealth, 20 Va. App. 562, 565, 458 S.E.2d 606, 607-08 (1995) (quoting Merritt v. Commonwealth, 164 Va. 653, 657, 180 S.E. 395, 397 (1935)).

> In order to convict an accused of attempted malicious wounding, the Commonwealth must prove that the accused: (1) intended to "maliciously shoot, stab, cut or wound any person or by any means cause bodily injury with the intent to maim, disfigure, disable or kill"; and (2) committed a direct but ineffectual act toward this purpose.

Crawley v. Commonwealth, 25 Va. App. 768, 772, 492 S.E.2d 503, 505 (1997). "The intent required to be proven in an attempted crime is the specific intent in the person's mind to commit the particular crime for which the attempt is charged." Wynn v. Commonwealth, 5 Va. App. 283, 292, 362 S.E.2d 193, 198 (1987).

"In determining whether the intent has been proven, the factfinder may consider the conduct of the person involved and all the circumstances revealed by the evidence." Id. "Intent may, and usually must, be proved by circumstantial evidence, such as a person's conduct and statements." Blow v. Commonwealth, 52 Va. App. 533, 539, 665 S.E.2d 254, 257 (2008)

- 14 -

(citation omitted). "[W]hether the required intent exists is generally a question for the trier of fact." Nobles v. Commonwealth, 218 Va. 548, 551, 238 S.E.2d 808, 810 (1977).

Appellant relies upon Crawley, 25 Va. App. 768, 492 S.E.2d 503, to argue that the evidence was insufficient to prove that appellant had the specific intent to shoot Beverly. The defendant in Crawley was convicted of attempted malicious wounding of Michelle Newman. Id. at 770, 492 S.E.2d at 504. Newman was riding in a car with Randy Tyrone Acree when the two encountered the defendant and his cousin, Benny Yancy, after a truck occupied by the defendant and Yancy "bumped" Acree's car. Id. at 771, 492 S.E.2d at 504. The defendant and Yancy had an "ongoing conflict" with Acree, and they had had physical altercations in the past. Id. Acree, Newman, Yancy, and the defendant stopped their cars and exited the vehicles to converse. Id. During the encounter, Yancy referenced Acree's earlier altercation with the defendant in a threatening manner. Id. When Newman asked Yancy to "leave [her and Acree] alone," Yancy responded that "[Newman] was the cause of the whole problem." Id. Newman asked the defendant if he thought she had "anything to do with what was going on," and the defendant responded that she "didn't have anything to do with it." Id. All four individuals returned to their cars, and when the defendant reached his truck, he "turned, drew his gun, and fired three times at Acree, striking him in the hip." Id. Newman stood "right beside" Acree on the driver-side of the car at the time of the shooting, "within reaching distance" of him. Id.

On appeal, this Court reversed the defendant's conviction, holding that the evidence was insufficient to prove that the defendant intended to wound Newman. Id. at 774-75, 492 S.E.2d at 506. The Court found that although the defendant had shot in Newman's direction, "other circumstantial evidence regarding [the defendant's] state of mind at the time of the shooting indicate[d] that Acree was his only intended target." Id. at 774, 492 S.E.2d at 506. In this

regard, the Court relied upon the ongoing animus and conflict between Acree and the defendant, the statements by Yancy, and the defendant's statement that Newman "was not the subject of his ire." Id. at 774-75, 492 S.E.2d at 506.

We find Crawley distinguishable from the instant case. Unlike in Crawley, there was ample evidence in this case that Beverly was involved in the altercation with appellant and therefore the subject of his ire. Beverly and appellant exchanged words shortly before the shooting. Although appellant and Joe also argued shortly before the shooting, unlike the defendant and Acree in Crawley, appellant and Joe were not involved in an "ongoing dispute" spanning weeks or days. Most critically, unlike in Crawley where the defendant specifically excluded Newman from involvement in the dispute, appellant in the case at bar did not say that Beverly was not involved in the incident on the street that evening. Appellant fired four or five shots at Beverly and Joe as they hid behind a tree, and Beverly testified that the shots came so close to her that she could feel them pass by her. In sum, circumstantial evidence regarding appellant's state of mind at the time of the shooting did not indicate that Joe was appellant's only intended target. Therefore, the trial court did not err in finding the evidence sufficient to support appellant's conviction for attempted malicious shooting of Beverly and use of a firearm in the commission of the attempted shooting.

### III. Conclusion

For the above reasons, we hold that the trial court did not err in any of the respects identified by appellant. Therefore, appellant's convictions are affirmed.

Affirmed.

- 16 -