COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, O'Brien and Senior Judge Haley
Argued at Fredericksburg, Virginia

CHRISTOPHER MICHAEL ELLIS

v.      Record No. 0256-18-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE JAMES W. HALEY, JR.
MAY 28, 2019

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Michael E. Levy, Judge

Joshua M. Parrett (Sharon A. Fitzgerald; Williams Stone Carpenter
Buczek, PC; Sharon A. Fitzgerald, LLC, on brief), for appellant.

Kelsey M. Bulger, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.

In a jury trial, Christopher Michael Ellis (appellant) pleaded not guilty by reason of

insanity to charges of first-degree murder, aggravated malicious wounding, and assault and

battery of a police officer. The jury convicted appellant for all three charges. The jury

recommended a sentence of life imprisonment and a $100,000 fine for both first-degree murder

and aggravated malicious wounding, and five years of imprisonment for assault and battery upon

a police officer. The trial court imposed the sentences recommended by the jury. On appeal,

appellant challenges the sufficiency of the evidence to sustain his conviction for aggravated

malicious wounding. Appellant argues that the evidence did not prove the injuries inflicted upon

Elizabeth Ellis, appellant's mother, were "permanent and significant," as required by Code

§ 18.2-51.2(A). Finding no error, we affirm appellant's conviction for aggravated malicious

wounding.

BACKGROUND

"In general, when reviewing a challenge to the sufficiency of the evidence to support a conviction, an appellate court considers the evidence in the light most favorable to the Commonwealth, the prevailing party below, and reverses the judgment of the trial court only when its decision is plainly wrong or without evidence to support it." Marshall v. Commonwealth, 69 Va. App. 648, 652-53 (2019). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" Chavez v. Commonwealth, 69 Va. App. 149, 161 (2018) (quoting Banks v. Commonwealth, 67 Va. App. 273, 288 (2017)). "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." Gerald v. Commonwealth, 295 Va. 469, 472 (2018) (quoting Scott v. Commonwealth, 292 Va. 380, 381 (2016)).

On December 11, 2015, appellant resided in the basement of Ellis' home at 532 Fagan Drive in Stafford County. Appellant had lived there since July of 2011. Appellant was unemployed and received disability benefits.

At about 5:10 a.m. on December 11, 2015, Sergeant Christian Mireles and Deputy Gregory Gabrielli responded to a report of a person screaming outside in the area of Fagan Drive and Butler Road. When he arrived at the location, Mireles did not find anyone screaming or in distress. However, Mireles looked behind the house at 532 Fagan Drive and saw appellant. Appellant was crouched down, and he was rocking back and forth. He was covered in blood. Mireles asked if appellant was all right. Appellant murmured a response, stood up, and punched Mireles in the face. During the fistfight that followed, appellant struck the officer in the face several times. Gabrielli joined the fray, and eventually the officers subdued appellant. After the

police had detained and handcuffed him, appellant made rambling statements that he had hit and kicked his mother and that she was dead upstairs. Appellant also appeared to be praying in a foreign language.

Looking for anyone who might need assistance, Gabrielli entered the house, and Mireles stayed outside with appellant. Gabrielli proceeded through the open sliding glass door to the basement and upstairs to the main level of the house. When Gabrielli reached the master bedroom at the end of the hallway, he saw a large amount of blood on the floor, walls, and closet door. Gabrielli found Ellis' dead body on the floor of the bedroom. The lower portion of Ellis' face was missing, and a hammer was sticking out of her throat. Ellis' nightgown had been pushed up over her waistline.

The police transported appellant to the sheriff's department and interviewed him over the course of about two and one-half hours. During the interview, appellant repeatedly admitted that he had killed Ellis. Appellant said that at about 5:00 a.m. he had gone to Ellis' bedroom, "hovered" over her bed for about twenty seconds, and yelled at her about taking his disability money. He climbed on the bed and, using both hands, punched Ellis in the face multiple times. Appellant turned on the light so that he could "see the look on her face." Appellant suffocated Ellis with his hand and licked her nostrils. Ellis was still alive, and she was begging for him to stop, although, appellant said, she was "basically dead." Ellis was still screaming for her dog.[1]

Appellant dragged Ellis off the bed to the floor. Appellant jumped onto Ellis' chest with his knees twice and "busted her chest." After he "broke her chest," Ellis was no longer communicating. Appellant decided that he "wasn't done," so he kicked her in the head "a bunch of times." Appellant said he used his right foot, and confirmed that that was "where all that blood [came] from."

---

[1] The police found a dog in the residence when they discovered Ellis' body.

Despite the injuries he had already inflicted upon Ellis, appellant "didn't think she was dead yet." He "wanted to make sure she was dead, so [he] went and got the hammer" to "break her brain open." Appellant left the bedroom, went down the hallway to the kitchen, and grabbed a hammer from a drawer.

Appellant returned to the bedroom and used the hammer to "bash in" Ellis' skull, teeth, nose, and eyes. Appellant elaborated:

> I took the hammer and I bashed her in the head a few times, bashed her in the nose three times, bashed her eyeballs in and bashed her skull several times. The second time I hit her it was the first time I hit her skull blood came out of the nose and I knew she was dead. I saw her because I knew she was dead. A few more times for good measure to insult her, ruined by damn life, and then I just took the hammer and just inserted it into her broken toothed up mouth just like that[.]

Before he used the hammer, Ellis' teeth were already damaged from the kicks he had inflicted. Appellant said that "it was beautiful." At some point, appellant pulled up Ellis' nightgown and kicked her in the genitals to insult her for giving birth to him.

Dr. William Gormley supervised the autopsy upon Ellis' body. X-rays showed multiple fractures of Ellis' upper jaw, nose, cheekbones, lower jaw, and the front portion of the skull. In addition to the fractures, there were multiple contusions and lacerations to the face and bruising of the tongue. The sides of Ellis' gums were lacerated, and teeth were missing or dislocated.

There were multiple lacerations of the frontal lobes of the brain, which caused hemorrhage into the basal ganglia. The basal ganglia, in the center of the brain, controls the body's consciousness. Destruction of the basal ganglia causes a loss of useful consciousness. Gormley opined that the hemorrhage into Ellis' basal ganglia would have caused incapacitation, or loss of useful consciousness. This injury was "unsurvivable," and would have rendered Ellis "brain dead."

Additionally, Gormley found "multiple contusions and lacerations" of Ellis' body. There was considerable bruising to Ellis' right shoulder, and multiple fractures of the ribs. The rib fractures would have caused her to have difficulty breathing, impacted the oxygenation of the brain, and caused a loss of consciousness. There was bruising to the sternum, the inside and outside of the heart, and the diaphragm. Ellis' liver was lacerated, and there was bleeding around the esophagus. She had sustained multiple contusions and lacerations on the arms and legs.

Gormley was unable to determine the order in which Ellis' injuries were inflicted. However, all of the bruising would have occurred while Ellis was still alive. Gormley opined that the most lethal injury was to the brain, but he did not identify one injury as the sole cause of Ellis' death. Instead, Gormley identified several injuries Ellis suffered that would have caused "loss of useful consciousness."

## ANALYSIS

Under Code § 18.2-51.2(A),

> [i]f any person maliciously shoots, stabs, cuts or wounds any other person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill, he shall be guilty of a Class 2 felony if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment.

Appellant argues that the Commonwealth failed to prove that he injured Ellis in a way that was "permanent and significant." Appellant maintains that, for an injury to be considered permanent and significant, the Commonwealth must prove that the victim survived it, for at least some period of time. According to appellant, because Gormley was unable to determine the order in which appellant inflicted the injuries to Ellis or precisely when she died, and because appellant's statement to the police was not reliable concerning the point at which Ellis died, the evidence was insufficient to sustain the conviction of aggravated malicious wounding. However,

to accept appellant's argument would be to read into Code § 18.2-51.2(A) an element of proof – survival of the injury for some specific interval of time – that the statute does not contain.

Code § 18.2-51.2(A) contains no definition for a "permanent" physical impairment. "[T]he general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used." Turner v. Commonwealth, 65 Va. App. 312, 323 (2015) (quoting Hubbard v. Henrico Ltd. P'ship, 255 Va. 335, 340 (1998)). Therefore, "[a]n undefined term must be 'given its ordinary meaning, given the context in which it is used.'" Id. (quoting Sansom v. Bd. of Supervisors, 257 Va. 589, 594-95 (1999)).

This Court has found that to prove a physical impairment is permanent under Code § 18.2-51.2, "the Commonwealth need not present definitive testimony that a victim's injuries will never improve" and that the determination of permanency is left to the "common sense of the [finder of fact]." Lamm v. Commonwealth, 55 Va. App. 637, 644-45 (2010). In addition, we have found "permanent and significant" impairments to include visible scars and scars connected to nerve damage. Newton v. Commonwealth, 21 Va. App.86, 90 (1995); Martinez v. Commonwealth, 42 Va. App. 9, 24-25 (2003).

The word "permanent" has been defined as "continuing or enduring (as in the same state, status, place) without fundamental or marked change." Webster's Third New International Dictionary 1683 (3d ed. 1993). We can conceive of no injury more significant and permanent as one which causes a victim's death. A fatal injury necessarily ends the victim's life and, with it, the opportunity for recovery. In this case, Gormley found that Ellis had suffered numerous injuries that would have been fatal if inflicted in isolation.

A victim must survive, if only briefly, for an injury to be considered "permanent" within the context of Code § 18.2-51.2, and the evidence proved that Ellis remained alive during

intervals of the attack.[2] In appellant's interview with the police, he recounted the sequence of events in vivid detail, beginning with his appearance in Ellis' bedroom at about 5:00 a.m. while she was sleeping. Appellant used both hands to punch Ellis numerous times in the face and head and suffocated her to the point that she was "basically dead." Ellis remained alive, however, begging appellant to stop and calling for the dog. Appellant then pulled his mother to the floor. He jumped onto her chest with his knees twice. Appellant had broken Ellis' chest, but he then proceeded to kick her in the head multiple times. Ellis was no longer communicating, but appellant still did not think she was dead. He went down the hallway to the kitchen to obtain the hammer to finish the task of killing Ellis. Upon return to the bedroom, appellant savagely beat in Ellis' skull, face, and teeth, ultimately forcing the hammer down her throat.

In addition, Gormley's testimony supports the conclusion that there was at least one interval in the incident when Ellis remained alive. During the autopsy, Gormley noted multiple contusions all over Ellis' body. Such bruising, Gormley explained, develops only while a victim remains alive. This evidence thus reinforces the conclusion that Ellis was alive after appellant punched her in the face, tried to suffocate her, pulled her off the bed, and beat her further on the floor. Thus, if, as in this case, it is established by the evidence and reasonable inferences therefrom that there was a temporal interval between the initial malicious wounding, with the victim remaining alive, and the subsequent death of the victim, then the defendant can be convicted of both aggravated malicious wounding and murder.

---

[2] At oral argument, appellant's counsel agreed with the following statement, "We are not saying that [Ellis] did not survive the original attack for some period of time." This concession tends to defeat appellant's argument that the evidence did not prove that Ellis survived some portions of the brutal attack.

- 7 -

CONCLUSION

For the foregoing reasons, we affirm appellant's conviction for aggravated malicious wounding.

<u>Affirmed.</u>