COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, AtLee and Malveaux
Argued at Richmond, Virginia


KEVIN MITCHELL

MEMORANDUM OPINION* BY
v.      Record No. 0066-23-2      JUDGE RICHARD Y. ATLEE, JR.
JULY 9, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
John Marshall, Judge

John W. Parsons (John W. Parsons, Attorney at Law, on brief), for
appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Appellant Kevin Mitchell appeals his convictions for first-degree murder, use of a firearm in

the commission of a murder, aggravated malicious wounding, and use of a firearm in the

commission of an aggravated malicious wounding. On appeal, Mitchell challenges the sufficiency

of the evidence. He contends that the Commonwealth failed to prove both that he was the person

who shot the victims and that the surviving victim suffered a permanent physical impairment. For

the following reasons, we disagree and affirm his convictions.

I. BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Jonathan Lancaster and Ashley Tolliver were in a romantic relationship. On May 4, 2021, they were staying at an Extended Stay America hotel in Henrico County with two friends. Realizing they were locked out of their room, Lancaster and Tolliver went to someone else's room in the same hotel. Later, Lancaster left that room for 10 to 15 minutes and returned to see a small bag in the room that he believed was not there when he left. Lancaster recognized the bag as belonging to Mitchell and accused Tolliver of engaging in sexual activities with him while he was gone.

Tolliver denied Lancaster's allegations and the two argued at length. During the argument, Lancaster dumped out the contents of the bag, including wireless earbuds and fentanyl. Lancaster threw one of the earbuds in the toilet and pocketed the fentanyl. As Tolliver and Lancaster continued to argue, an acquaintance called Mitchell and informed him of Lancaster's belief that Mitchell and Tolliver had been "messing around."

Mitchell and his cousin, Randy Mayo, then came to the room. After Mitchell arrived, he watched Lancaster and Tolliver continue their argument with a "smirk" on his face. Lancaster did not address Mitchell regarding his belief that Mitchell and Tolliver had engaged in sexual activities.

After 20 to 30 minutes, Mitchell took his bag and left. Later that day, Lancaster used fentanyl and went to a nearby convenience store with Tolliver and two friends. At the store, the group encountered Mayo. Lancaster saw that Mayo was carrying a small black handgun in his back pocket. When the group returned to the hotel from the store, Lancaster and Tolliver sat on the outdoor staircase.

- 2 -

Shortly before 9:00 p.m., while Lancaster sat on the staircase, he "felt a gun on the top of [his] head." He turned and saw Mitchell standing above him on the staircase holding the same gun that Lancaster had seen in Mayo's pocket. Although Mitchell was wearing a COVID mask over his mouth, Lancaster saw Mitchell's nose, eyes, ears, and hair, and recognized him because he had "been seeing him all day" and knew "who he [was]." Lancaster asked Mitchell what he was doing. Mitchell did not respond, but he walked to the bottom of the stairs and pointed the firearm "straight at" Tolliver. Lancaster stepped in front of Tolliver, and Mitchell fired multiple shots, hitting Lancaster in the left cheek, chest, and right arm.

Lancaster "kind of fell back" on Tolliver as he tried "to make sure that she was behind [him] so she wouldn't get shot." As Lancaster ran up the stairs, he heard two more shots and saw Tolliver running behind him. After he got "a little way further," he looked back and saw Tolliver on the ground on the upper-level walkway. He saw that she had been shot and sat beside her. Mitchell fled the scene. Immediately after the shooting, Lancaster told bystanders and law enforcement officers who responded to the scene that Mitchell shot him.

Emergency personnel transported Lancaster and Tolliver to the hospital, where Tolliver was pronounced dead. An autopsy confirmed that she died from two bullet wounds to the chest. Lancaster spent five days in the hospital, where he underwent surgery to remove the bullet from his cheek.

The police arrested Mitchell on May 6, 2021. At trial, more than 15 months after the shooting, Lancaster testified that the bullets remained in his right arm and chest.[1] The bullet was "poking out" of his arm, and "at some point" there would "be a surgery to remove it." He testified that the doctors had decided to leave the bullet in his chest because of its location. He

---

[1] Lancaster admitted that he had been convicted of two felony offenses and that he struggled with drug addiction.

averred that it had become difficult to hold things in his right arm, and, specifically, he could not hold his kids like he used to. If he tried to hold something in his arm "for a while," his hand would shake. He also testified that it was starting to affect his whole arm.

Detective Burroughs, whom the trial court qualified as an expert in cellular records analysis, testified that he obtained the cell site data and call detail records for Mitchell's phone. Burroughs used a software program to "map" Mitchell's phone on May 4, 2021, which made or received four calls between 8:39 and 8:53 p.m. that day. The Extended Stay where the shooting occurred was within the sector of the cell phone tower used for those calls. When Mitchell's phone made a call at 9:02 p.m., it used a different cell tower "facing away from the crime scene."

Mitchell moved to strike the evidence, which the trial court denied. Mitchell then testified in his own defense. On May 4, 2021, he was staying at the Extended Stay with Mayo and another cousin. Mitchell agreed that, as Lancaster testified, he had witnessed Lancaster and Tolliver argue over Lancaster's claim that she and Mitchell had engaged in sexual conduct. Mitchell testified that he had not had "any sexual relationships" with Tolliver and that he had no animosity against Lancaster. Lancaster indicated that he wanted to fight Mitchell but "never came outside," so Mitchell ultimately returned to his room.

Mitchell also testified that a friend picked him up and dropped him off at the Super 8 motel "[u]p the street" from the Extended Stay "later on that night." On cross-examination, he stated that he did not know what time his friend picked him up from the hotel, although he thought it was "early evening." He said she dropped him off after 11:00 p.m. Mitchell further claimed that he gave his phone to Mayo on May 4, 2021, because Mayo did not have a working phone. He claimed he got the phone back after his friend dropped him off. He testified that he was not at the hotel at the time of the shooting.

The trial court denied Mitchell's renewed motion to strike, and the jury convicted him of all charges. Mitchell now appeals.

## II. ANALYSIS

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

### A. Identity

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "We review the fact finder's determination regarding the identity of the perpetrator considering 'the totality of the circumstances.'" *Shahan*, 76 Va. App. at 258 (quoting *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002)).

Lancaster unequivocally identified Mitchell as the shooter at trial. Mitchell first argues that, under the factors enumerated in *Neil v. Biggers*,[2] Lancaster's identification was unreliable, and thus was insufficient to establish guilt beyond a reasonable doubt. But Mitchell did not make this argument in the trial court.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Not just any objection will do." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). "Procedural-default principles require that the argument asserted on appeal be the same as the contemporaneous argument at trial." *Id.*

Mitchell does not ask this Court to apply the good cause or ends of justice exceptions, and we will not invoke those exceptions sua sponte. *Hogle v. Commonwealth*, 75 Va. App. 743, 756 (2022); *see also Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc). Accordingly, we do not consider his argument that Lancaster's identification was unreliable under the *Biggers* factors.

Mitchell next contends that Lancaster "was not a reliable witness" and "there was very little reason to show why . . . Mitchell would have the motive to commit this crime." But "determining the credibility of the witnesses and the weight afforded the testimony of those

---

[2] 409 U.S. 188 (1972) (holding that the witness' opportunity to view the perpetrator at the time of the crime, their degree of attention, the accuracy of their prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation are relevant factors to be evaluated when determining the reliability of an eyewitness identification); *see Cuffee*, 61 Va. App. at 364.

witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). This Court "may only disturb the trial court's credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable [people] ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Nothing about Lancaster's testimony identifying Mitchell as the shooter is so contrary to human experience as to render it unworthy of belief. Lancaster testified that earlier on the day of the shooting, he had accused Tolliver of engaging in sexual conduct with Mitchell at the hotel. Mitchell later witnessed part of an argument between Tolliver and Lancaster but left without engaging in any conflict with either of them. Mitchell himself confirmed on the stand that he had witnessed the couple argue over Lancaster's accusation that Tolliver had engaged in sexual conduct with Mitchell. Lancaster then identified Mitchell as the person who shot him and Tolliver shortly before 9:00 p.m. that evening. He stated that he knew Mitchell, was familiar with his appearance, and could identify him from his nose, ears, eyes, and hair.

Mitchell argues that multiple factors undercut Lancaster's credibility, including his statement that the shooter was wearing a mask covering his mouth, the fact that he did not describe Mitchell's clothing, and Lancaster's drug use. Mitchell also asserts that Lancaster "inaccurate[ly]" testified that Tolliver was shot while running away, when in fact she was shot in the chest. Despite Mitchell's claims, these inconsistencies do not render Lancaster's testimony inherently incredible.

Instead, these inconsistencies are weighed by the jury when assessing his credibility. *See Cuffee*, 61 Va. App. at 366.

The jury likewise could have considered several facts that bolstered the credibility of Lancaster's testimony. Specifically, Lancaster identified Mitchell immediately after the shooting, thereby undermining Mitchell's suggestion that Lancaster fabricated his identification testimony at trial. Moreover, the cell site data established that Mitchell's cell phone was near the hotel at the time of the shooting.[3]

The jury heard all the evidence, and it was the jury's role to determine the credibility of the witnesses and weigh the evidence. Considering the totality of the evidence, a reasonable factfinder could conclude beyond a reasonable doubt that Mitchell was the shooter.

B. Aggravated Malicious Wounding

Any person who "maliciously shoots . . . any other person . . . with the intent to maim, disfigure, disable or kill" is guilty of aggravated malicious wounding "if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment." Code § 18.2-51.2. Mitchell does not contest that Lancaster suffered a significant physical impairment but argues that the impairment was not permanent.

The aggravated malicious wounding statute does not define permanent; thus, we must give that term its "ordinary meaning, given the context in which it is used." *Ellis v. Commonwealth*, 70 Va. App. 385, 391 (2019) (quoting *Turner v. Commonwealth*, 65 Va. App. 312, 323 (2015)). "The word 'permanent' has been defined as 'continuing or enduring (as in the same state, status, place) without fundamental or marked change.'" *Id.* at 392 (quoting *Permanent*, *Webster's Third New International Dictionary* (3d ed. 1993)). "[T]o prove a

---

[3] The jury was entitled to reject Mitchell's testimony that Mayo had his cell phone at the time of the shooting.

physical impairment is permanent under Code § 18.2-51.2, 'the Commonwealth need not present definitive testimony that a victim's injuries will never improve'" and "the determination of permanency is left to the 'common sense of the [finder of fact].'" *Id.* (second alteration in original) (quoting *Lamm v. Commonwealth*, 55 Va. App. 637, 644 (2010)).

At trial, more than 15 months after the shooting, bullets remained in Lancaster's chest and right arm. He stated that the doctors had decided to leave the bullet in his chest because of its placement. Lancaster indicated that the bullet in his right arm was "poking out" and that "at some point" there would "be a surgery to remove it." He explained that it was difficult to hold things in his right arm and, specifically, that he could not hold his kids like he used to. If he tried to hold something in his arm for a while, his hand would shake. He also testified that it had "started to affect [his] whole arm."

A factfinder, using common sense, could find that Lancaster suffered a permanent physical impairment. His testimony established that the impairment to his right arm had continued, if not worsened, for more than a year after the shooting. Although Lancaster expected that the bullet would be surgically removed, there was no evidence regarding whether, or to what extent, the surgery would ameliorate the impairment to his arm. Accordingly, the jury could conclude that the impairment would persist. Moreover, to the extent that the jury concluded that the bullet in Lancaster's chest was a physical impairment, Lancaster's testimony supported a finding that it would remain there indefinitely. Accordingly, the jury properly convicted Lancaster of aggravated malicious wounding.

### III. CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*