UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Fulton and Lorish

ANTHONY CHARLES HUNTER

v.     Record No. 1853-23-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION*
PER CURIAM
DECEMBER 17, 2024

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge

(B. Thomas Reed, on brief), for appellant.  Appellant submitting on brief.

(Jason S. Miyares, Attorney General; Jessica M. Bradley, Assistant Attorney General, on brief), for appellee.

Following a bench trial, the Circuit Court of the City of Norfolk convicted Anthony Charles Hunter of one count of armed burglary, in violation of Code § 18.2-90; one count of robbery, in violation of Code § 18.2-58; two counts of use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1; and one count of wearing a mask to conceal his identity, in violation of Code § 18.2-422.  On appeal, Hunter challenges the sufficiency of the evidence to establish his identity as the criminal agent.  After examining the briefs and record in this case, the panel unanimously holds that oral argument is unnecessary because "the dispositive issue or issues have been authoritatively decided, and the appellant has not argued that the case law should be overturned, extended, modified, or reversed."  Code § 17.1-403(ii)(b); Rule 5A:27(b).

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

# I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

Timothy Watson testified at trial that in September 2020, he lived in a house in Norfolk. He also owned the house next door, which he was in the process of renovating. Watson had hired several workers, including Hunter, to assist with the renovation. Watson recalled that he had met Hunter through Hunter's brother, who Watson had known for over 20 years, and Watson knew Hunter by the nickname "Ant." For "anywhere from six to ten hours a day" over a period of approximately two weeks, Hunter and the other men worked on Watson's renovation project. Watson would pay the workers, including Hunter, "with cash at the end of the day." Watson maintained that he "supervised the whole project" and that he "was sociable with all the fellows." He noted that he allowed the workers to periodically use the refrigerator and the toolroom in his personal residence to store items, and he explained that he would "escort everybody that went into my house." Watson estimated that Hunter was with him in his personal home "[p]robably two to three" times.

Watson further testified that around 5:00 a.m. on September 17, 2020, he "was in the midst of waking up" when an armed, masked intruder came through his bedroom window. He recounted "[t]he front of the fan being tossed through my room, kicked into my room, looking up and seeing an individual coming through, masked, firearm already up in the air facing me, yelling, screaming."

The intruder pointed his firearm at Watson's forehead and stated, "Give me money. I know you have money in the house. I know you got money." Watson recalled that as the intruder

> was banging in, obviously my first instinct was to reach where my money was and retrieve something of monetary value to give him. I retrieved I think $100, just to pacify him. That was the quickest thing I could draw out of my pocket. I handed that to him, but obviously it wasn't enough.

The intruder "continued demanding money" while pointing his firearm at Watson. Watson remarked, "As the time was going on, I began to more and more recognize the demeanor, the tone of voice, the actions and then, of course, the voice I definitely understood. When I called his name, he froze, lost all facial expression." Watson explained that "something told me I know this person. I recognize him as being Ant." He further recounted, "As I started calling his name, obviously it was over with, he grabbed the sweatpants that I had been digging through and made his way toward the front door. He already knew how to get there because he had been in the house before." Watson testified that his wallet was in his sweatpants and that his wallet contained several thousands of dollars in cash.

After the intruder left Watson's house, Watson called 911. He told the operator, "Someone just came through my window and robbed me. I know who it is, too." He identified the intruder as "Ant Hunter." At trial, Watson described the intruder's physical characteristics, saying, "I recognized everything about him." He stated that the intruder had "a sway to him, kind of walking slumped over," and that Hunter "always had that when he worked for me, as well." Watson stated that the intruder also had "a bald section on the top of his head, which was recognizable." In addition, the intruder "was wearing a T-shirt" around his face, which Watson explained "was the same T-shirt that the guys were using while working for me." Watson recognized the intruder's graying beard because his mask "moved around quite a bit," and he noted that Hunter "always wore his beard similar to mine." He also recognized the intruder's voice and his tone because he had

- 3 -

heard Hunter "get loud before." According to Watson, the intruder's height was around "five seven to five eight" — the same height as Hunter — and the intruder had "[m]edium to dark skin." Watson pointed out that Hunter never came back to work again after the incident and that he never heard from Hunter again after the incident.

The Commonwealth moved into evidence video surveillance footage from several security cameras that were installed in and around Watson's house. Watson testified that one of the videos from an exterior camera captured "Ant on the right-hand side retrieving the ladder we put there the day before." That same video showed the intruder placing the ladder against the house, climbing several rungs up the ladder, and then watching Watson through the window for several minutes before climbing through the window. Another video from an interior camera in Watson's bedroom showed the intruder outside the window before he knocked the fan onto the floor and entered the bedroom with a firearm pointed at Watson. That same video then showed Watson grabbing his sweatpants off the floor and handing the intruder an item from inside a pocket of the sweatpants before the intruder grabbed the sweatpants and left the bedroom. Video footage from additional security cameras showed the intruder leaving Watson's house through the front door and then running down the street while carrying a firearm and the pair of sweatpants.

Special Agent Robert Blythe, a member of the cellular analysis survey team with the Federal Bureau of Investigation, testified at trial as an expert in the analysis of historical call detail records. He analyzed Hunter's T-Mobile cell phone records and determined that there were "two incoming phone calls that went to the target phone's voicemail at 4:41 and 4:42 a.m." on September 17, 2020. He also determined that at 5:10 a.m. that same day, Hunter's cell phone connected to the T-Mobile cell tower that was closest to Watson's house. In addition, Special Agent Blythe determined that on September 17, 2020, "the target cell phone utilized this tower 45445-1 to the north and east of the crime scene, as well as 53201-9 to the south and east of the crime scene between 5:22 and 5:49 a.m.

for three incoming phone calls and three data sessions." He opined that Hunter's "phone was somewhere in between these two towers" at that same period of time.

After the Commonwealth presented its evidence, counsel for Hunter moved to strike "based upon the lack of a thorough investigation," arguing that "we don't have any forensic evidence." The trial court denied Hunter's motion to strike, finding that "[b]ased upon Mr. Watson's identification, it's certainly sufficient at this stage." Hunter did not present any evidence in his defense, and his counsel renewed his motion to strike. The trial court found Hunter guilty of one count of armed burglary, in violation of Code § 18.2-90; one count of robbery, in violation of Code § 18.2-58; two counts of use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1; and one count of wearing a mask to conceal his identity, in violation of Code § 18.2-422. In making his ruling, the trial judge opined, "I think Mr. Watson's identification of the defendant is about as clear and certain as I've heard." The trial judge emphasized that Watson "testified he knew his voice. He knew the way he moved, the way he walked. When he said his name, the defendant left rather quickly, which the video did show. I think there's sufficient evidence." Hunter now appeals to this Court.

## II. ANALYSIS

On appeal, Hunter contends, "The Trial Court erred in denying Hunter's motion to strike the Commonwealth's evidence on the ground that the evidence did not support a finding that the Commonwealth had proved Hunter's guilt beyond a reasonable doubt." He argues that Watson's identification was insufficient to establish him as the intruder because "that identification was not supported by any physical evidence ordinarily associated with a crime scene."

At the outset, we note that the Supreme Court has recently clarified that "an identification analysis does not address the sufficiency of the evidence." *Sample v. Commonwealth*, 303 Va. 2, 16 (2024). Rather, an identification analysis "focuses upon due process considerations," which "is a

very different thing than evaluating the identification within a sufficiency matrix." *Id.* "Motions to strike, on the other hand, 'deal with the sufficiency rather than the admissibility of evidence.'" *Id.* (quoting *Woodson v. Commonwealth*, 211 Va. 285, 288 (1970)). Because Watson's identification did not present due process concerns or involve the admissibility of evidence, we analyze the sufficiency of the evidence to sustain Hunter's convictions.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration and emphasis in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (emphasis in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder." *Commonwealth v. Perkins*, 295 Va. 323, 328 (2018) (emphasis omitted) (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009)). Thus, we "accept the trial court's determination of

the credibility of witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (quoting *Walker v. Commonwealth*, 258 Va. 54, 71 (1999)).

Here, Watson reliably identified Hunter as the masked, armed intruder who broke into his bedroom, repeatedly pointed a firearm at his head, and stole several thousand dollars in cash. Watson had ample opportunity to observe Hunter, having just employed and supervised Hunter for approximately two weeks during Watson's ongoing renovation project. Watson consistently identified Hunter as the intruder, including during his 911 call soon after the incident, during his subsequent interaction with law enforcement, and during his testimony at trial. Watson also paid close enough attention to Hunter's appearance that he could identify Hunter's gait, his voice, his balding head, his graying beard, his height, his skin color, and the T-shirt partially wrapped around his face. In addition, Watson observed the intruder physically reacting to Watson saying the name "Ant," which prompted the intruder to quickly leave Watson's house. Furthermore, Watson expressed a high level of certainty in identifying Hunter, testifying that he was positive that Hunter was the intruder. Finally, Special Agent Blythe testified that Hunter's T-Mobile cell phone was in the vicinity of the crime scene around the same time that the break-in and robbery occurred. Therefore, considering the totality of the circumstances, we certainly cannot say that no rational factfinder could have found the evidence sufficient to prove beyond a reasonable doubt that Hunter was the intruder and that he was guilty of the charged offenses.

### III.  CONCLUSION

For all of the foregoing reasons, we affirm the trial court's judgment, and we uphold each of Hunter's convictions.

*Affirmed.*