COURT OF APPEALS OF VIRGINIA

Present:    Judges Huff, O'Brien and Senior Judge Frank
Argued by teleconference


RAKALE JONES, S/K/A
 RAKALE L. JONES
                                                    MEMORANDUM OPINION[*] BY
v.       Record No. 0426-19-1                        JUDGE ROBERT P. FRANK
                                                         APRIL 7, 2020
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Mary Jane Hall, Judge

Kristin Paulding (7 Cities Law, on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Rakale Jones, appellant, was convicted by a jury of robbery, in violation of Code

§ 18.2-58[1]; use of a firearm in the commission of a robbery, in violation of Code § 18.2-53.1;

conspiracy to commit robbery, in violation of Code § 18.2-22; and carjacking, in violation of

Code § 18.2-58.1.  On appeal, appellant argues that the evidence was insufficient because the

victim's identification of him as a perpetrator was inherently incredible.  For the following

reasons, we affirm.

BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth,

the prevailing party in the trial court."  Commonwealth v. Perkins, 295 Va. 323, 323 (2018) (per

curiam) (citation omitted).  "Viewing the record through this evidentiary prism requires us to

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Following post-trial motions, the trial court dismissed the robbery charge.

'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" Id. at 323-24 (citation omitted).

Around midnight on October 30, 2016, Dasia Martin arranged to meet Jaquerius Barker to "go out to eat" and smoke marijuana at Martin's sister's house. Barker picked up Martin at her house in Portsmouth, and Martin gave Barker directions to her sister's house in Norfolk. On the way, Barker stopped at a Wells Fargo ATM and used a debit card to withdraw money for gas.

After the pair left the bank, Martin directed Barker to park in a "particular spot" in a parking lot behind an apartment complex. Martin had been "texting somebody" during the car trip and "got on the phone with somebody" when they exited Barker's car. She told the person, "We're here. We're here where my old house used to be." As they were walking, Martin stopped Barker and told him that she had left her cell phone charger in his car; Barker returned to his car to retrieve the charger.

As Barker exited the car with the charger, he saw three men running toward him. From the light of a nearby streetlight, Barker saw that the men were wearing "[b]andanas all the way up to . . . the bridge of their noses, skullies[,][2] and hoodies drawn tight." Barker recalled that the first man was black, dark-skinned, about Barker's size or perhaps a bit taller, and of "skinny to average" build. He was carrying a handgun with a long magazine. The second man, whom Barker later identified as appellant, was black, light-skinned, about Barker's height, and had an average build; he was unarmed. Barker did not "get a good look" at the third man but saw that he was black and carrying a handgun that was "similar to a 9-millimeter handgun."

_____

[2] Barker explained that by "skullies" he meant hats "pulled back over . . . the top of their head[s]."

Barker dropped to his hands and knees after the men approached him. The first man walked up to Barker's left side, pointed the gun at Barker's head, and demanded that Barker "give him everything." He also demanded that Barker provide the "fucking pin to the Wells Fargo debit card" even though Barker had not mentioned having a Wells Fargo bank account. Appellant stood right in front of Barker, kicked him in the head, and removed Barker's shoes, pants, and gold diamond earring. Appellant threw the shoes and pants, which contained Barker's wallet and cash, into the backseat of Barker's car but held the earring in his hand.

After the assailants had taken all of his belongings, Barker got onto his knees and was "chest to chest" with appellant. At that point, Barker and appellant were "facing each other," and Barker "could look at him in his face." One of the men directed Barker to stand up and run into a nearby field. Wearing only boxers and white socks, Barker ran into the field. As he did so, he heard three gunshots and was "petrified" that he was going to be shot in the back. After Barker was sufficiently far away, he peered over his shoulder and saw the men driving away in his car. During the encounter, Martin did not run or act surprised. Rather, she "pulled her hood over her head" and walked away; the men did not talk to her or attempt to take anything from her.

Barker made his way to a nearby McDonald's, where an employee called the police. Appellant described the perpetrators to Norfolk Police Detective Mark Lowery. The first man was a black male, approximately 5'5" and eighteen years old, had a "thin build," and was wearing a black bandana over his face and all black clothing. Barker also told Lowery that the first man had "distinctive eyes." The second man was a black male, about 5'5", and was wearing a black bandana over his face, all black clothing, and gloves. The third man was approximately 5'5" and was wearing all black clothing.

When he initially spoke with Detective Lowery, Barker could not provide any additional identifying information about the robbers. Later that day, however, Barker returned home and attempted to identify the robbers. He remembered that somebody with an account name of "Romodo OTW Reap," whom he did not know, had attempted to "follow" him on Instagram[3] shortly before the incident. Barker located a picture of Reap on Instagram and immediately recognized him as the first robber who had pointed a gun at his head because of his "very distinctive" eyes. Barker then visited Martin's Facebook account and saw a picture of Martin and Reap together; Martin had captioned the picture, "My boy."

Barker then visited Reap's Facebook account, where he saw a photograph of three men standing together. Barker again recognized Reap as one of the men in the photograph. Barker also recognized appellant in the photograph as the second robber because of his "head shape and bushy eyebrows." Barker testified that appellant's height and build in the photograph were consistent with his recollection of the second robber. Barker emailed the photograph to Lowery, indicating that Reap had been one of the robbers, but he did not identify appellant in his email.

A few days later, Officer Frank St. George saw Barker's stolen vehicle parked in front of an apartment building with three young people standing next to it. A "young black female" was walking toward the rear of the car from the driver's side door and two "skinny," "younger black males" were on the passenger side. St. George parked his vehicle and approached the female, who, by that time, was standing at the door of a nearby apartment. St. George identified the female as Martin and "took her into custody." Under a stairwell less than five feet from where Martin had been standing, St. George found a vehicle key that locked, unlocked, and started

---

[3] Instagram is "a social media platform" that allows its users to share "photographs and videos" that "are usually accompanied by text commentary describing the photograph, although [text] is not required." Lauren Myers, A Picture Is Worth A Thousand Material-Connection Disclosures: Endorsers, Instagram, and the Federal Trade Commission's Endorsement Guides, 66 Duke L.J. 1371, 1376 (2017).

Barker's vehicle. St. George searched the vehicle and found 9-millimeter "ammunition cartridges" in the center console. St. George could not locate the two males, but the parties stipulated that appellant's mother lived in the apartment building.

Detective Lowery spoke with Martin and developed appellant as a suspect. Lowery created a photo lineup consisting of six photos of black males; the fifth photo depicted appellant, and the others depicted individuals with "similar features" as appellant. Each photo was in a separate manila folder. Detective Peter Farnsworth, who was not involved in the investigation and did not know who the suspect was, administered the lineup to Barker six weeks after the incident. Barker looked at the series of photos twice. He identified no one during the first viewing. During the second viewing, Farnsworth used a manila envelope to cover the bottom half of the pictures, mirroring the bandanas worn during the attack, and Barker selected appellant's photograph, saying, "[t]hat's him." Barker told Farnsworth that he recognized appellant's eyebrows, head shape, and nose.[4]

Barker testified that when he first saw appellant in court he had "no doubt" that appellant was one of the robbers. He testified before the jury that he was "[a] hundred percent" sure that appellant was "one of the boys out there that night, the one without a gun." Barker acknowledged, on cross-examination, that it was dark outside but stated that there was enough light to see. He confirmed the description of appellant that he had given to Detective Lowery at the McDonald's shortly after the incident, which did not include a description of appellant's eyebrows or head shape. Barker explained that when he was speaking with Lowery he was still

_____

[4] Farnsworth testified that Barker responded to appellant's photograph during the second viewing by saying, "[that] could possibly be [him], but I'm not pretty sure." According to Farnsworth, Barker identified appellant's photograph by "the head shape and the eyes and the nose." Barker's testimony clarified, however, that Barker told Farnsworth that the fifth photo could "possibly be him" before Farnsworth "put the manila folder up to his face." After the bottom of appellant's photo was covered by the folder, appellant positively identified appellant, saying, "[t]hat's him."

"petrified" because he had "just had a gun to [his] head." Barker also confirmed that he initially had told Lowery that only one of the perpetrators had a gun.

On redirect examination, appellant stood in the courtroom, and Barker testified, while viewing appellant, that appellant had the same height and "exactly the same" build as the second perpetrator. He had no doubt that appellant was the second perpetrator, testifying, "[h]e was the one."

The jury convicted appellant of robbery, use of a firearm in the commission of a robbery, conspiracy to commit robbery, and carjacking. Following post-trial motions, however, the trial court dismissed the robbery charge. This appeal follows.

## ANALYSIS

On appeal, appellant challenges the sufficiency of the evidence to establish that he was one of the perpetrators, contending that Barker's identification was "inherently incredible." He points to various inconsistencies in Barker's testimony, Barker's inability to identify appellant during the first photo spread, Barker's failure to clearly describe appellant to Detective Lowery shortly after the incident, Barker's allegedly equivocal identification during the lineup, Barker's erroneous description of appellant as "light skinned," and Barker's vague descriptions of all three assailants. In sum, appellant attacks the credibility of Barker's identification of appellant.

"When a defendant on appeal challenges the sufficiency of the evidence to sustain a conviction, we must examine the evidence that supports the conviction and allow the conviction to stand unless it is plainly wrong or without evidence to support it." Cuffee v. Commonwealth, 61 Va. App. 353, 363 (2013) (quoting Vincent v. Commonwealth, 276 Va. 648, 652 (2008)); see also Code § 8.01-680. This Court "does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Id. (quoting Stevens v. Commonwealth, 46 Va. App. 234, 249 (2005) (*en banc*)). Rather, the issue on appeal is "whether, after viewing

the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Maxwell v. Commonwealth, 275 Va. 437, 442 (2008)). Accordingly, "[i]f there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" Chavez v. Commonwealth, 69 Va. App. 149, 161 (2018) (quoting Banks v. Commonwealth, 67 Va. App. 273, 288 (2017)).

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." Cuffee, 61 Va. App. at 364 (quoting Blevins v. Commonwealth, 40 Va. App. 412, 423 (2003)). The factors set forth in Neil v. Biggers, 409 U.S. 188 (1972), are used to determine "whether the identification evidence is sufficient, standing alone or in combination with other evidence, to prove beyond a reasonable doubt" the identity of the perpetrator.[5] Brown v. Commonwealth, 37 Va. App. 507, 522 (2002); see also Smallwood v. Commonwealth, 14 Va. App. 527, 530 (1992).

---

[5] In Neil v. Biggers, the United States Supreme Court established factors for determining whether a witness' identification of a defendant, though the product of an unnecessarily suggestive confrontation, is sufficiently reliable to be admissible in evidence. 409 U.S. at 198-200. Those factors were not originally established to guide an analysis of whether the evidence presented at trial was sufficient to establish the identity of a defendant as the perpetrator beyond a reasonable doubt. Id.; see also Townes v. Commonwealth, 234 Va. 307, 331 (1987) (adopting the Biggers factors "for determining whether a particular identification is reliable").

Notwithstanding the context in which Biggers was decided, in Smallwood v. Commonwealth, 14 Va. App. 527, 530 (1992), this Court reversed the defendant's conviction after applying the Biggers factors to conclude that the witness' in-court identification of the defendant as the perpetrator was insufficient to establish his criminal agency. See also Brown, 37 Va. App. at 522-23 ("The factors set forth in Neil v. Biggers . . . are relevant in determining whether the identification evidence is sufficient, standing alone or in combination with other evidence, to prove beyond a reasonable doubt that [the defendant] robbed [the victim]." (citing Smallwood, 14 Va. App. at 530)). Yet, in other cases, we have adhered to applying the Biggers factors only to determine the admissibility of a witness' identification. See, e.g., Hopkins v. Commonwealth, 20 Va. App. 242, 252 (1994); Hill v. Commonwealth, 2 Va. App. 683, 692-93 (1986). Our jurisprudence is clear that admissibility challenges are distinct from sufficiency

> [T]he factors to be considered in evaluating the likelihood of
> misidentification include the opportunity of the witness to view the
> criminal at the time of the crime, the witness' degree of attention,
> the accuracy of the witness' prior description of the criminal, the
> level of certainty demonstrated by the witness at the confrontation,
> and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200. In evaluating the reliability of the identification, this Court looks to the totality of the circumstances. Brown, 37 Va. App. at 523 (citing Satcher v. Commonwealth, 244 Va. 220, 249 (1992)).

Here, Barker had a good opportunity to view the second robber at the time of the incident. After the men had taken all of Barker's belongings, Barker came "chest to chest" with the man. Barker testified that they were "facing each other" and, from that close proximity, Barker was looking "at him in his face." Thus, Barker had an excellent opportunity to view appellant at the time of the crime, and his identification was reliable under the first Biggers factor. See Charity v. Commonwealth, 24 Va. App. 258, 263 (1997) (holding that the victim's identification of the defendant was not unreliable under the Biggers factors where the victim had observed the perpetrator for seventeen seconds and came within ten feet from him).

Although appellant's face was partially covered by a bandana, the Supreme Court of Virginia has held that a victim's identification of a masked assailant was reliable when the victim displayed a high degree of attention to specific features, identifying the assailant by his "figure,

---

challenges. See Bowling v. Commonwealth, 51 Va. App. 102, 106 (2007) (holding that "whether evidence is admissible at trial and whether it is sufficient to prove the charges against an accused are two completely separate legal questions, requiring two distinct legal analyses").

Appellant does not challenge the admissibility of any of Barker's in-court or out-of-court identifications of appellant; rather, he relies on the Biggers factors in his sufficiency argument. Under the inter-panel accord doctrine, a holding by one panel of this Court "bind[s] all other three-judge panels." Startin v. Commonwealth, 56 Va. App. 26, 39 n.3 (2010) (*en banc*). A decision of one panel protected by the inter-panel accord doctrine "cannot be overruled except by the Court of Appeals sitting *en banc* or by the Virginia Supreme Court." Congdon v. Comonwealth, 40 Va. App. 255, 265 (2003). Thus, we apply the Biggers factors in evaluating appellant's sufficiency challenge.

weight, hair length and color, nationality, and skin tone." Phan v. Commonwealth, 258 Va. 506, 511 (1999); see also Hammer v. Commonwealth, 207 Va. 165, 168 (1966) (holding that a victim's identification of a masked assailant "by his voice, his eyes and his build" was reliable). Here, Barker demonstrated his high degree of attention to the second robber's features by relying on his head shape, bushy eyebrows, and nose in making the identification.

Barker also exhibited a high degree of attention regarding each of the robbers' actions, statements, and weapons. Barker observed that the first robber walked to Barker's left side, pointed the gun at Barker's head, and demanded that Barker "give him everything," including the PIN to his debit card. Barker also specifically noted that appellant was not armed, stayed in front of Barker, kicked him in the head, and removed his shoes, pants, and gold diamond earring. Barker continued watching appellant as he threw Barker's belongings into the back seat of the car, which provided Barker the opportunity to specify appellant's height and build.

Barker's high degree of attention during the incident translated into three unequivocal identifications of appellant as the second robber. Indeed, on the day of the incident, Barker saw a picture of appellant on Facebook and positively identified him as the second robber based on his "head shape and bushy eyebrows." Barker also testified that when he saw appellant at the preliminary hearing he had "no doubt" that appellant was the second robber. He also told the jury that he was "[a] hundred percent" certain that appellant had been the second robber, testifying that appellant had the same height and "exactly the same" build. See Cuffee, 61 Va. App. at 365-66 (holding that a witness' identification of the perpetrator was reliable, even though the witness "testified that she was not '[one] hundred percent' certain," because the witness "observed [the] appellant face-to-face" and specifically described his hair and skin tone).

It is undisputed that Barker did not identify appellant during the first viewing of the photo lineup, and Barker testified that he was only able to positively identify appellant during the

- 9 -

second viewing after appellant's face was partially covered by a manila folder. However, an "in-court identification" that is "unequivocally positive" is the "most significan[t]" factor "on the subject of [a witness'] level of certainty." Satcher, 244 Va. at 250. And in this case, Barker provided two unequivocally positive in-court identifications of appellant, first at the preliminary hearing and then at trial. Additionally, while appellant's trial was approximately twenty-one months after the carjacking, Barker positively identified appellant in a Facebook photo *on the same day* as the incident. Cf. Martin v. Commonwealth, 210 Va. 686, 692 (1970) (holding that the evidence was sufficient to prove the defendant's identity as the perpetrator because the victim's in-court identification, although not "sure," was corroborated by the victim's "positive identification" of the defendant "immediately following the offense"). Accordingly, the twenty-one-month period of time between the carjacking and the trial does not undermine the reliability of appellant's in-court identifications. See Satcher, 244 Va. at 250 (holding that the "lapse of [fifteen months] is not sufficient to render an identification unreliable as a matter of law" when the victim's in-court identification was "unequivocally positive").

Barker acknowledged, on cross-examination, his vague description of the second robber to Detective Lowery at the McDonald's shortly following the incident: black, about 5'5", and wearing black clothing and gloves. At trial, Barker described the second robber in more detail, describing his build, head shape, and bushy eyebrows. Appellant seizes upon the vagueness of Barker's "prior description" to argue that his subsequent identifications and more detailed descriptions were unreliable. The differences in Barker's descriptions of appellant, however, are not as significant as appellant's argument assumes.

In Brown, the victim described the defendant to the police as "a light-skinned black male with curly black hair, approximately 5'11" tall, in his early to mid-thirties, wearing a white baseball shirt with blue and black stripes[,] and a pierced earring in his ear." 37 Va. App. at 522.

In reality, the defendant had "long hair, [was] 5'5" tall, [did] not wear a pierced earring in his ear and [was] twenty years old." Id. At trial, however, the victim positively identified the defendant as her assailant, and this Court affirmed the conviction after analyzing the victim's testimony under the Biggers factors. Id. at 522-24.

Here, the variations in Barker's descriptions of appellant are not so dramatic. Barker did not misjudge appellant's height by six inches, nor did he incorrectly state that appellant wore an earring. Rather, he simply gave a vague description of the second robber immediately after the incident. A vague description, however, is not necessarily inaccurate. Biggers, 409 U.S. at 199-200 (holding that "the *accuracy* of the witness' prior description of the criminal" is a factor to consider when weighing the reliability of an identification (emphasis added)). Moreover, Barker explained the lack of detail in his initial description by testifying that he had "*just* had a gun to [his] head" and was still "petrified." (Emphasis added). See Brown, 37 Va. App. at 522 (noting that a victim's "past inability or reluctance to identify" the defendant as the perpetrator was explainable because she was "very nervous," "very frightened," and "scared" at the time of the identification).

Lastly, corroborating evidence supported Barker's identification of appellant as the second robber. Id. (holding that the Biggers factors are relevant in determining "whether the identification evidence is sufficient standing alone *or in combination with other evidence*, to prove" the identity of the perpetrator (emphasis added)). The photograph taken from Reap's Facebook account demonstrated that appellant had associated with Reap and an unidentified third black male. Additionally, Officer St. George later arrested Martin, a co-conspirator in the robbery and carjacking, with two young black males after she parked Barker's stolen car at the apartment complex where appellant's mother lived. Those circumstances strengthen Barker's testimony that appellant, Reap, and Martin joined, with another unidentified black male, in the

offenses against him.  Corroborating evidence, Black's Law Dictionary (11th ed. 2019)

("Corroborating evidence" is "[e]vidence that differs from but strengthens or confirms what

other evidence shows.").

Appellant argues nevertheless that Barker's testimony was "inherently incredible."  He

notes that Barker did not mention appellant when he emailed the Facebook photo to Lowery.

Appellant further contends that Barker did not positively identify appellant during the second

viewing of the photo lineup; instead, appellant invites this Court to adopt Detective Farnsworth's

testimony that Barker's identification was equivocal.  Appellant also argues that it is "simply

unbelievable" that Barker's confidence in his identification of appellant improved between the

photo lineup and his in-court identifications.

"Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought

not to believe it' or shown to be false by objects or things as to the existence and meaning of

which reasonable men should not differ."  Gerald v. Commonwealth, 295 Va. 469, 487 (2018)

(quoting Juniper v. Commonwealth, 271 Va. 362, 415 (2006)).  "In other words, this Court

cannot say a witness' testimony is inherently incredible unless it is 'so contrary to human

experience as to render it unworthy of belief.'"  Lambert v. Commonwealth, 70 Va. App. 740,

759 (2019) (quoting Johnson v. Commonwealth, 58 Va. App. 303, 315 (2011)).  "The mere fact

that a witness may have delayed in reporting knowledge of a case or given inconsistent

statements during the investigation of a crime does not necessarily render the testimony

unworthy of belief."  Juniper, 271 Va. at 415.  Instead such circumstances are "appropriately

weighed as part of the entire issue of witness credibility, which is left to the jury to determine."

Id.; Kelley v. Commonwealth, 69 Va. App. 617, 626 (2019).

Thus, Barker's failure to mention appellant when he emailed the Facebook photo of

appellant and Reap to Lowery, and his increased confidence in his identification of appellant

from the lineup to trial, were circumstances relevant to the jury's credibility determination.  See

Manson v. Brathwaite, 432 U.S. 98, 116 (1977) ("[E]vidence with some element of

untrustworthiness is customary grist for the jury mill.").  Indeed, the jury in this case heard an

in-depth cross-examination of Barker regarding those issues as well as conflicting testimony,

even from the victim.  And appellant's counsel capably argued those differences and

inconsistencies to the jury.  Nevertheless, after considering all of the evidence, the jury credited

Barker's account and convicted appellant.  See Commonwealth v. McNeal, 282 Va. 16, 22

(2011) (holding that the fact-finder's "evaluations of credibility are not limited to choosing

between competing accounts offered by different witnesses but often include, as in this case,

resolving conflicts in a single witness' testimony" (internal citation omitted)).  Moreover, as

noted above, the balance of the Commonwealth's evidence corroborated Barker's testimony.

Lambert, 70 Va. App. at 760 (holding that a witness' testimony was not inherently incredible

when it was corroborated by other evidence).

"When the law says that it is for triers of the facts to judge the credibility of a witness, the

issue is not a matter of degree.  So long as a witness deposes as to facts [that], if true, are

sufficient to maintain their verdict," and "[i]f the trier of the facts sees fit to base the verdict upon

that testimony[,] there can be no relief in the appellate court."  Smith v. Commonwealth, 56

Va. App. 711, 718-19 (2010) (quoting Swanson v. Commonwealth, 8 Va. App. 376, 379 (1989)).

Accordingly, we hold that Barker's testimony was not inherently incredible, and we will not

accept appellant's invitation to reweigh the facts and reach the opposite conclusion of the jury.

CONCLUSION

In sum, Barker positively recognized appellant as the second robber in the Facebook

photo on the day of the incident.  He also identified appellant six weeks later in the photo lineup,

at the preliminary hearing, and at trial.  Barker based the identification on specific details he

observed while "chest-to-chest" with the second robber, looking directly into his face, and displayed a high degree of attention. Additionally, the balance of the Commonwealth's evidence corroborated the identifications. Thus, we find that evidence was sufficient to establish appellant's criminal agency.

Affirmed.