COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Athey, Causey and Chaney
Argued at Williamsburg, Virginia


JAYSON ALYOSHA NEWKIRK

                                                    MEMORANDUM OPINION* BY
v.        Record No. 2123-23-1              JUDGE CLIFFORD L. ATHEY, JR.
                                                    AUGUST 26, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
Carl E. Eason, Jr., Judge

Ashby Leigh Pope (Riddick & Pope, on brief), for appellant.

Robert D. Bauer, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


On September 7, 2023, Jayson Alyosha Newkirk ("Newkirk") was convicted in the

Circuit Court of the City of Suffolk ("trial court") on two counts of robbery in violation of

Code § 18.2-58 and two counts of using a firearm while in the commission of a felony in

violation of Code § 18.2-53.1.  He was sentenced to 28 years of incarceration.  On appeal,

Newkirk assigns error to 1) the trial court's admission of video evidence, 2) the witnesses'

identification of him as the perpetrator, 3) the trial court's failure to use sentencing guidelines,

and 4) the accuracy of the trial court's sentencing order.  For the following reasons, we affirm.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

## I. Background[1]

On May 5, 2021, Newkirk was charged with one count of robbery for taking money from Kylie McCormick ("McCormick") and one count of robbery for taking money from Diane Drew ("Drew"), both of whom were tellers at BayPort Credit Union ("BayPort"). Newkirk was also charged with using a firearm in the commission of both robberies.[2] Newkirk was tried before a jury on September 6 and 7, 2023.

After the jury was empaneled and both parties completed their opening statements, the Commonwealth called McCormick as its first witness. She testified that she was working as a bank teller at BayPort on May 4, 2021. During her testimony, McCormick indicated without objection that Newkirk was the "man who robbed [her]" on that day. She also testified that when Newkirk told her to "give him all the money," McCormick complied but placed a GPS tracking device on the money before handing the money to Newkirk. McCormick also confirmed that Newkirk was approximately two feet away from her during the robbery, which she estimated as lasting for approximately 1 minute and 30 seconds. She further testified that although Newkirk covered his head, his face remained visible and was uncovered. In addition, McCormick testified that she had followed Newkirk's demands because she was scared and because Newkirk "had a gun." McCormick testified further that as Newkirk was leaving BayPort, he became

---

[1] "On appeal, 'we review the evidence in the "light most favorable" to the Commonwealth,' the prevailing party below." *Diaz v. Commonwealth*, 80 Va. App. 286, 295 (2024) (quoting *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc)). This principle "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc)).

[2] Newkirk was also charged with two counts of armed burglary of a bank in violation of Code § 18.2-93, robbery using a firearm in violation of Code § 18.2-58(2), two counts of possession of a firearm by a convicted violent felon in violation of Code § 18.2-308.2, and an additional count of using a firearm in the commission of a felony in violation of Code § 18.2-53.1. These charges are not at issue in this appeal.

frustrated because he could not get the front door to open for him. McCormick added that Newkirk said, "[I]f [the door] didn't open, he was going to shoot this place up." When informed of the correct exit door, Newkirk left.

During her testimony, McCormick also reviewed numerous photographs of BayPort taken during the robbery. She was asked to identify the individual in one of the photographs, to which McCormick answered that it "look[ed] like Mr. Newkirk." When shown another photograph, McCormick responded that it showed "Newkirk with a gun in his hand." Upon being shown additional photographs of the robbery, she responded by pointing out "Mr. Newkirk with the gun," "me handing Mr. Newkirk the money," "me and Mr. Newkirk while he's up at the counter with the gun," "Mr. Newkirk," "Mr. Newkirk with a gun in his hand," and "when Mr. Newkirk went to leave the credit union." She also testified that Newkirk was wearing "a white hoodie" that had "some designs on it." After publishing the photographs to the jury, the Commonwealth asked McCormick if she had "[a]ny doubt that . . . Newkirk [was] the man who robbed [her] at gunpoint." McCormick responded that she had "no doubt." Each of McCormick's multiple identifications of Newkirk, as well as the numerous photographs depicting the robbery of BayPort, was admitted in evidence without objection.

On cross-examination, Newkirk asked McCormick why she had not participated in the photographic lineup conducted by the police after the robbery. McCormick responded that since the lineup was conducted the day after the robbery, she was not present because she had taken personal time off from work that day. McCormick acknowledged that she had not seen Newkirk prior to the day of the robbery but reiterated that she had seen him during the robbery for about 1 minute and 30 seconds.

Drew, who testified next, also identified Newkirk as the person who robbed her on May 4, 2021. Drew recounted that because of COVID-19 protocols she asked Newkirk to put on a

mask, to which he responded that he did not have a mask but instead had "this" and showed her a gun. She also testified that Newkirk commanded her to give him "everything you have" and she complied. She testified that between her and McCormick, they surrendered about $3,000 of BayPort's money to Newkirk. She also repeatedly identified Newkirk as the perpetrator in multiple photographs from the date of the robbery, all without objection.

During cross-examination, Drew was asked if she had participated in the photo lineup conducted by police. She answered that she had. Newkirk then confronted Drew with her preliminary hearing testimony where Drew had indicated she had *not* completed a photo lineup. When asked to explain the discrepancy between her preliminary hearing testimony and her trial testimony, Drew was unable to do so. Drew also admitted that she did not recall seeing Newkirk before the robbery. Drew agreed that Newkirk was only in the bank for about 1 minute and 30 seconds. On re-direct examination, Drew testified that during her interaction with Newkirk at BayPort the day of the robbery, his face was uncovered during the entirety of the robbery.

Next, Victoria Wood ("Wood") testified that she also worked at BayPort and was present when the bank was robbed on May 4, 2021. She testified that she was in the same area of the bank as Drew and McCormick when the robbery occurred. She recounted how she instructed Newkirk to wear a mask upon entering BayPort and Newkirk refused before producing a gun. She recalled how she was scared when she realized "we're going to get robbed." On cross-examination, Wood recalled participating in a photo lineup with police after the robbery. Newkirk then presented Wood with the six pictures that were previously shown to her during the photo lineup. Wood acknowledged that the person she had selected in the lineup as the perpetrator was not Newkirk. On re-direct examination, the Commonwealth showed Wood one of the previously admitted photographs of the robbery. Wood identified the person in the

photograph wearing a "hoodie on their head that's white" with "red and black markings" as the person who robbed BayPort on May 4, 2021.[3]

Lieutenant Casey Thomas ("Lieutenant Thomas") of the Suffolk Police Department testified that she was a sergeant in the criminal investigations division in May of 2021. She testified that she and another detective began tracking the stolen money using the GPS tracking device McCormick attached to the stolen money. The tracker initially led them to an area in Newport News, but the tracking device ceased to operate at that point. Lieutenant Thomas subsequently reviewed surveillance footage from Bowie Market, a convenience store in the vicinity of the area where the tracking device stopped working. Newkirk objected to Lieutenant Thomas testifying about the video footage based on the "best evidence rule." The trial court overruled the objection, agreeing with the Commonwealth that Lieutenant Thomas testifying about the video did not violate the best evidence rule. Instead, the trial court stated that Lieutenant Thomas's statements about the video were hearsay. The Commonwealth responded by offering to withdraw its questions about what Lieutenant Thomas saw on the video. Following a brief recess, the court sustained the objection to Lieutenant Thomas testifying about the video.

Lieutenant Thomas next testified that during her subsequent investigation, she explored the area around Bowie Market looking for evidence pertaining to the robbery. She further testified that she located a sweatshirt inside of a trash can located outside Bowie Market that "matched the description of what our suspect was wearing during the robbery." She also located a broken GPS tracking device in a separate area in a nearby apartment complex. She collected

---

[3] Towanda Robinson, another employee of BayPort who was working the day of the robbery, did not see Newkirk's face and was unable to make a selection during her photo lineup.

the sweatshirt and stored it in a brown paper bag before transferring it to Julie Vevers ("Vevers"), a forensic technician for the Suffolk Police Department.

Vevers testified that she responded to Bowie Market on May 4, 2021, for the purpose of collecting evidence. She recounted that she physically retrieved video from the store's surveillance system using a USB drive. She also testified that she did not alter the video footage before or after downloading it from the system. When the Commonwealth sought to enter the video in evidence, Newkirk objected, arguing that the video had not been properly authenticated. In support of his objection, Newkirk contended that the trial court could only authenticate the video under two grounds, either as "a silent witness" or "to illustrate witness testimony." Newkirk, however, acknowledged that only the "silent witness" theory of admission was viable. The Commonwealth agreed and proposed that the video be entered in evidence and played for the jury as a silent witness. The Commonwealth further represented that the video did not display assertive conduct to the extent that the video would be considered hearsay. The trial court then ruled that the video, which depicted Newkirk throwing his sweatshirt away in the trash can outside Bowie Market, was "clearly an assertion." The trial court then reviewed still photographs taken from the video footage, each of which showed a date and time in the top left corner of the photograph.

Newkirk next asserted that the trial court "ruled that [the video] was hearsay yesterday."[4] The trial court responded that "there are exceptions to the hearsay rule," which prompted Newkirk to begin discussing why the business records exception to the hearsay rule did not apply to the video recording. Newkirk then argued that members of the Suffolk Police Department were not qualified witnesses under the business records hearsay exception. The trial court

---

[4] Later in the trial court's dialogue with both parties, the trial court clarified that Lieutenant Thomas's "testimony has nothing to do with what's going on today."

overruled Newkirk's objection as to authentication and hearsay, finding that "Vevers is a competent witness as a forensic technician" and could testify as to the authentication of the video. The trial court further held that the video had been properly authenticated because it contained "a timestamp of date and time for when this video was created." Finally, the trial court held that Vevers was not categorically disqualified as a qualified witness under the business records exception simply because she was not an employee of Bowie Market. The trial court admitted the video recording, although it was not played for the jury at that time.[5]

Lieutenant Thomas was then recalled as a witness by the Commonwealth and further testified that she looked in the trash can outside of Bowie Market after viewing the Bowie Market surveillance footage. The jury then viewed the previously admitted video evidence.[6]

Brendan Graney ("Graney"), employed by the Virginia Department of Forensic Science at the Norfolk Crime Laboratory, testified next as an expert in forensic biology. He testified that he had previously received a DNA sample from Newkirk, as well as the white hooded sweatshirt from the trash can outside Bowie Market. He testified that a DNA mixture profile was

---

[5] Vevers continued to testify, noting that she collected seven fingerprints from BayPort and submitted the fingerprints into property and evidence. She also testified that she swabbed the counter in BayPort to collect any potential DNA samples that may have been present. Mary Delugo ("Delugo") testified next for the Commonwealth. She worked as the forensic supervisor of the crime scene units at the Suffolk Police Department. She stated that none of the prints collected by Vevers from BayPort were in good enough condition for any comparison.

[6] In a sidebar prior to the jury viewing the video, Newkirk renewed his objection to the video. The trial court responded that it would note Newkirk's objection to the video evidence "as continuing." But after playing the video for the jury, the Commonwealth admitted three still photographs from the video without objection from Newkirk. The Commonwealth then submitted another photograph, which depicted the interior of Bowie Market. In response, Newkirk responded that "actually, Judge, because of my previous objection I think I need to object to all of those since they come as a result of the video, so if the Court would note that for the record." The trial court responded, "Objection overruled, exception noted." After admitting an additional photograph, the trial court asked Newkirk if he had "[a]ny objection other than what's previously noted." Newkirk responded, "None other," and the trial court replied, "Objection overruled, exception noted."

developed from multiple places on the sweatshirt and that Newkirk's DNA was present on the sweatshirt.

Next, Detective Steven Cooke ("Cooke") of the Suffolk Police Department testified that he had known Newkirk for five years and then identified him as sitting at his seat in the courtroom. The Commonwealth also showed Cooke the previously admitted photographs taken during the robbery at BayPort, which depicted Newkirk robbing Drew and McCormick. Cooke identified Newkirk in each photograph without objection. The Commonwealth then rested.

Newkirk moved to strike the Commonwealth's case. In support, he contended that with regard to the use of a firearm in the commission of a felony charges, the Commonwealth had failed to prove that the firearm was operational.[7] The trial court then inquired if "that [was] the extent of the motion, just on those three charges?" Newkirk confirmed the extent of the motion to strike, noting that "the Commonwealth has at least met the threshold issues on the robbery." The trial court ruled that proof of operation was not required and "therefore overrule[d] the three motions to strike." Newkirk declined to present any evidence, nor did he testify on his own behalf. Newkirk did not renew his previous motions to strike, the trial court instructed the jury with respect to the law governing the case, and both parties presented closing arguments. The jury then retired to deliberate and returned their verdicts, finding Newkirk guilty on each count of robbery and guilty on each count of using a firearm in the commission of a felony.

On November 16, 2023, Newkirk filed a written motion to set aside the verdict. In it, he argued that the jury "could not have given the appropriate weight to the testimony of all the witnesses." He further claimed that the victims of the robbery "were not all able to positively identify" Newkirk. He further asserted that McCormick was "never shown a photo line-up" and

---

[7] Newkirk also made a motion to strike the charge of burglarizing a bank, which was the third charge later referenced by the trial court. He was ultimately acquitted of this charge.

had "only seen" Newkirk in court. Finally, he claimed that the Bowie Market surveillance footage and photographs were improperly admitted because both were "hearsay . . . without the proper authentication from the store owner or representative under the business records exception to the hearsay doctrine."

The trial court denied Newkirk's motion to set aside the verdict before sentencing Newkirk on November 27, 2023. After hearing evidence and argument from both parties during the sentencing hearing, the trial court orally pronounced, "What I'm going to do on both of the bank robbery charges, on both of those, I'm going to sentence you to ten years in the Virginia state penitentiary." The trial court then stated that "[o]n the two use of a firearm charges" it would impose three and five years of incarceration respectively.

Following the sentencing hearing, the trial court entered separate sentencing orders for each conviction. On each of the two counts of robbery, Newkirk was sentenced to ten years' incarceration with no time suspended. On the first count of using a firearm in the commission of a felony, Newkirk was sentenced to three years' incarceration with no time suspended. On the second count of the same charge, Newkirk was sentenced to five years' incarceration with no time suspended. Newkirk appealed.

## II. ANALYSIS

A. *Any error in admitting the surveillance video from Bowie Market was harmless.*

Newkirk asserts that the video recording obtained from Bowie Market was improperly admitted in evidence under the business records exception to the hearsay rule because Vevers was not a "qualified witness." Assuming without deciding that the trial court erred, we conclude that any error was harmless.[8]

_____

[8] We also presume that Newkirk properly preserved these arguments. *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (holding that judicial restraint requires deciding cases "on the best and narrowest grounds available"); *Ali v. Commonwealth*, 75

"Harmless error is a legislative mandate, which has been part of our statutory law since the early 1900s, and limits the adjudicatory power of Virginia appellate courts." *Commonwealth v. White*, 293 Va. 411, 419 (2017). Virginia law requires that "no judgment shall be arrested or reversed" for "any error committed on the trial" when "it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. This Court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." *Commonwealth v. Paxton*, ___ Va. ___, ___ (May 29, 2025) (quoting *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015)). It is "'the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless' lest they 'retreat from their responsibility, becoming instead "impregnable citadels of technicality."'" *White*, 293 Va. at 420 (quoting *United States v. Hasting*, 461 U.S. 499, 509 (1983)). "An appellate court can conclude that a non-constitutional error is harmless 'if it can conclude that the error did not influence the jury or had but slight effect.'" *Welsh v. Commonwealth*, ___ Va. ___, ___ (Mar. 20, 2025) (quoting *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022)). "To reach this conclusion, the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the" conviction. *Shaw v. Commonwealth*, ___ Va. ___, ___ (Apr. 17, 2025) (quoting *Kilpatrick*, 301 Va. at 217). "An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same." *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1006 (1991) (en banc).

Here, the evidence of Newkirk's guilt was so overwhelming that any error in admitting the surveillance video was harmless. The introduction of the surveillance footage from Bowie

Va. App. 16, 37 n.9 (2022) ("The mechanism of assuming without deciding a particular point in issue sometimes facilitates the appellate court's achievement of this goal.").

- 10 -

Market did, at most, have "slight effect" on the jury. *Welsh*, ___ Va. at ___. Lieutenant Thomas's testimony was that she followed McCormick's GPS tracker to the area of Bowie Market and found the tracker nearby. Lieutenant Thomas then watched Bowie Market's surveillance footage and in turn located the distinctive sweatshirt that matched the one worn by Newkirk in BayPort. Forensic analysis determined that Newkirk's DNA was present on the sweatshirt. Illustrating the testimony of Lieutenant Thomas about how she found the transmitter—by watching the surveillance footage that depicted Newkirk placing the sweatshirt in the trash can—would at best have had "slight effect" on the jury's determination of Newkirk's guilt. *Id.* Playing the video that Lieutenant Thomas viewed was largely duplicative of the testimony that Lieutenant Thomas already gave. Additionally, Drew and McCormick repeatedly identified Newkirk as the person who robbed them wielding a firearm, authenticating and identifying Newkirk from multiple photographs from BayPort's surveillance system. Cooke also identified Newkirk based on the same photographs. Therefore, we find that any error in admitting the Bowie Market surveillance footage was harmless.

B. *The evidence was sufficient to convict Newkirk of all charges.*

Newkirk also argues that the evidence was insufficient to convict him because the identifications of Drew and McCormick were "prejudicial and unreliable." Specifically, he argues the identification is unreliable because Drew and McCormick are a different race than Newkirk, that Drew and McCormick had "no prior knowledge" of Newkirk before he robbed the bank where they worked, and that Drew and McCormick's "only identification of [Newkirk] was in court." Assuming without deciding that Newkirk preserved this objection, we disagree and find the evidence sufficient.[9]

---

[9] Newkirk's argument at the motion to strike was focused on the operability of the firearm, not on the issue of identification, with Newkirk noting that "the Commonwealth has at least met the threshold issues on the robbery." But Newkirk did file a motion to set aside the

At the outset, we note that Newkirk is not challenging the *admissibility* of the in-court identifications but instead asserts that the identifications make the evidence *insufficient* to convict him. When reviewing challenges to the sufficiency of the evidence on appeal, the issue is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Maxwell v. Commonwealth*, 275 Va. 437, 442 (2008). Accordingly, "[i]f there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). We use the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972), to determine "whether the identification evidence is sufficient, standing alone or in combination with other evidence, to prove beyond a reasonable doubt" the identity of the perpetrator.[10] *Brown v. Commonwealth*, 37 Va. App. 507, 522 (2002).

---

verdict, which included some of the same grounds he argues on brief. We address the merits of his argument as part of our duty to resolve cases on the "best and narrowest grounds." *Swann*, 290 Va. at 196.

[10] Based on controlling case law from this Court, we apply the *Neil v. Biggers* factors to this situation, although Newkirk is not advancing a due process argument. *Smallwood v. Commonwealth*, 14 Va. App. 527, 530 (1992); *see Jones v. Commonwealth*, No. 0426-19-1, slip op. at 7 n.5 (Va. Ct. App. Apr. 7, 2020) (applying the *Biggers* factors in evaluating a sufficiency challenge because of the inter-panel accord doctrine); *see also Clark v. Commonwealth*, No. 1694-22-1, slip op. at 6-7 (Va. Ct. App. Jan. 23, 2024) (collecting cases). *But see Sample v. Commonwealth*, 303 Va. 2, 16-17 (2024) ("Because [the witness'] identifications did not present due process concerns and were admissible into evidence at trial, we give deference to the trial court's finding that both identifications were credible and cannot say that no rational trier of fact could find them credible."). It is not clear from *Sample* whether this Court's case law regarding the use of the *Biggers* factors in sufficiency cases is overruled. If *Sample* does in fact announce

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200.  In evaluating the reliability of the identification, this Court looks to the totality of the circumstances.  *Brown*, 37 Va. App. at 523.

Applying these factors to the present case, Newkirk's challenge fails.  First, both bank tellers were able to clearly observe Newkirk's unobstructed face during the entirety of the robbery, which lasted approximately 1 minute and 30 seconds.  The photographic and testimonial evidence reflected that Newkirk was only a few feet from both tellers while he threatened them with a firearm, and the bank lobby was well-lit.  Second, the same photographic and testimonial evidence showed that the tellers were paying close attention to Newkirk as they sought to comply with his commands, engaging with him throughout the robbery until he attempted to leave the bank through the wrong door.  Third, the record does not contain the results of a photo lineup for the witnesses at issue, but it does contain numerous still-frame shots from BayPort's surveillance system that provide a close-up record of what Newkirk looked like on the day of the robbery.  Fourth, McCormick said that she had "no doubt" that Newkirk was the person who robbed her, and the record likewise does not contain any hesitancy from Drew regarding her identification.  Fifth, the robbery of Drew and McCormick occurred on May 4, 2021, and the tellers testified on September 6, 2023.  This roughly two-and-a-half-year span is

---

a new test, Newkirk would fail under that test as well.  Under *Sample*'s framework—which only applied the *Biggers* factors to the identifications themselves and not the sufficiency of the evidence—our only task would be to "give[] deference to the trier of fact's finding of witnesses' credibility" and refrain from opining "upon the credibility of the witnesses where their evidence is not inherently incredible."  *Sample*, 303 Va. at 16 (quoting *Gerald v. Commonwealth*, 295 Va. 469, 486 (2018)).  As Newkirk has not argued that the identifications were inherently incredible, we would also affirm under *Sample*'s framework.

not so long as to diminish the accuracy of the tellers' identification. *See Satcher v. Commonwealth*, 244 Va. 220, 250 (1992) ("[T]he lapse of time alone is not sufficient to render an identification unreliable as a matter of law."). Therefore, under the totality of the circumstances, the identifications of Drew and McCormick do not render the evidence insufficient to convict Newkirk of the charges.

    C. *We do not reach Newkirk's third and fourth assignments of error, as his objections were not preserved and we decline to apply the ends of justice exception to Rule 5A:18.*

Newkirk admits that his third and fourth assignments are waived under Rule 5A:18 but asks us to invoke the ends of justice exception to that rule. He first asserts that he "was not afforded his right to have the sentencing guidelines prepared as they should have been" and that the "bulk of the time on the sentence can likely be attributed to the lack of guidelines in this matter." He next argues that "error has occurred in the preparation of the sentencing order since it is not reflective of what the court ruled and how that is reflected in the transcript of the [s]entencing hearing." We cannot reach these arguments, as the ends of justice exception does not apply.

"'The ends of justice exception [to Rule 5A:18] is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)). Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)). "In order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Redman*, 25 Va. App. at 221.

"The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)). The "exception requires proof of an error that was 'clear, substantial and material.'" *West v. Commonwealth*, 43 Va. App. 327, 338 (2004) (quoting *Brown v. Commonwealth*, 8 Va. App. 126, 132 (1989)). "Virginia courts applying the ends-of-justice exception require a defendant to present not only a winning argument on appeal but also one demonstrating that the trial court's error results in a 'grave injustice' or a wholly inexcusable 'denial of essential rights.'" *Winslow v. Commonwealth*, 62 Va. App. 539, 546-47 (2013) (quoting *Brittle*, 54 Va. App. at 513). "Where the record does not affirmatively establish error, we cannot invoke the ends of justice exception to Rule 5A:18." *Smith v. Commonwealth*, 59 Va. App. 710, 724 (2012).

Here, Newkirk cannot meet the high burden of demonstrating that an injustice did in fact occur regarding the absence of sentencing guidelines. The sentencing guidelines are discretionary, and "the failure to follow any or all of the provisions of [Code § 19.2-298.01] in the prescribed manner shall not be reviewable on appeal." Code § 19.2-298.01. Newkirk's equivocal language that his sentence "can likely be attributed" to allegedly erroneous guidelines demonstrates his inability to show that a miscarriage of justice did in fact occur. *Redman*, 25 Va. App. at 221.

Turning to the purported variance between the trial court's comments and Newkirk's sentencing orders, Newkirk likewise cannot carry his heavy burden to demonstrate that an injustice did occur that warrants excusing his lack of a contemporaneous objection. The trial court orally pronounced that Newkirk would be sentenced to ten years on each count of robbery. The sentence imposed on all four charges was within the range for Newkirk's four convictions. The trial court then articulated four individual sentencing orders, one for each of Newkirk's

convictions.  In arguing that the singular "sentencing order" was error, Newkirk fails to note the deliberateness of the trial court in sentencing.  He likewise does not demonstrate that there was a difference of any kind, let alone a fatal difference, between the trial court's use of "10 years on each robbery conviction" at the sentencing hearing with its separate sentencing orders that show 10 years' incarceration with no time suspended as to each robbery conviction.  As such, we decline to apply the ends of justice exception to Rule 5A:18, and Newkirk's arguments regarding his sentence are waived.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*